WINCHESTER BRITTON *vs.* INHABITANTS OF CUMMINGTON.

A person journeying on a highway does not necessarily forfeit his rights as a traveller while he stops to pick berries by the wayside.

At the trial of an action against a town on the Gen. Sts. *c.* 44, § 22, these facts were proved: The plaintiff, while driving on the highway with his wife and four young children, in a two-seated carriage, the fore wheels of which turned under its body, drawn by a pair of large horses, stopped on a level place, where the way ran along a precipitous bank, ten or twelve feet above a river and unguarded by any barrier; alighted; and walked back ten or twelve feet, to pick berries by the wayside; leaving the reins with his oldest son, who was twelve and a half years of age, accustomed to drive, and as competent and skilful as any boy of that age. His wife soon called to him to return, for the head of one of the horses was caught; and stepping to the heads of the horses he found their standing in the same position in which he had left them, but that the check-rein of one was hitched over the blinder of the other. While he was trying to unhitch it, first this horse, and then both horses, backed, so that in not more than a quarter of a minute, and within twelve feet of where he stood, the body of the carriage was swung around and one of the hind wheels went over the bank, he meanwhile endeavoring to pull the horses so as to keep them in the line of the road. *Held,* that, on these facts, the questions (1) whether the plaintiff had ceased to be a traveller at the time of the accident; (2) whether there was due care on his part; (3) whether, if he lost control of the horses, the loss was but momentary; and (4) whether the way was defective for want of a barrier; were all for the jury.

At a new trial, the foregoing facts were varied by evidence that the highway was narrow, and bounded by a high and wooded hill on the side opposite the bank, at the place where the plaintiff stopped; that he stopped in the centre of the road; that the horses, though gentle, were powerful and high spirited, and the boy with whom he left the reins had never driven them alone; that (without any evidence as to the competency and skill of this boy as compared with boys in general) he was physically and mentally the smartest boy the plaintiff had at his age; that when the plaintiff stopped and walked back to pick berries, he observed the river below the bank, but did not observe the precipitous slope of the bank, or observe or think whether there was any railing; that the bank was seven or eight feet high; that when one and before both of the horses began to back he seized the bits with both of his hands; that they did not back more than two or three feet before both hind wheels of the carriage went over the bank; that the carriage then

drew the horses over by its weight; that until they went over he exerted himself to stop them from backing, and afterwards to keep them at right angles with the carriage so that they should not fall on it; and that, about the time when the carriage struck the water the horses saw the bank and jumped, and he and they went over the bank together. *Held*, that the question whether there was due care on the part of the plaintiff was still for the jury.

TORT on the Gen. Sts. *c.* 44, § 22, for injuries alleged to have been received by the plaintiff by being hurt in his person and having his horses and carriage injured through a defect in a highway leading from Cummington to Windsor, which the defendants were bound to keep in repair, and on which the plaintiff was travelling with due care. The answer denied all the plaintiff's material allegations.

At the trial in the superior court, before *Pitman*, J., the defendants admitted that the highway was one which they were bound to keep in repair, and the plaintiff's testimony concerning the accident tended to show that the facts were as follows :

The plaintiff, who was a resident of New York, was journeying with his wife and four young children in a two-seated carriage, called a " rockaway," the fore wheels of which turned under its body, drawn by a pair of horses fully sixteen hands tall, which held their heads high. On August 6, 1870, as he was driving over this highway, seeing some raspberries by the wayside, he stopped to pick them, as he had done on several other occasions during the journey. At the place where he stopped, the highway ran along the bank of a branch of the Westfield River, ten or twelve feet above the stream. He handed the reins to his oldest son (who was twelve and a half years old, accustomed to drive, and as competent and skilful as any boy of that age) and alighted from the carriage, walked back ten or twelve feet, and began to pick the berries. His wife soon called to him to return, for the head of one of the horses was caught ; and what then occurred the plaintiff, in his own words, described thus : " I stepped to his head, and tried to take off the check rein of the other horse, which was then over the blinder of this one. The team had not started from the position in which I left them. It was on a dead level. As I sought to free the check rein, the horse raised his head. I was not tall enough to reach. The other

horse then began to back. I saw the carriage was cramping and likely to go off. The horses continued to back, and I to pull them round. The carriage went slowly over the bank, which was perpendicular. From the time when the horse commenced backing it was not more than a quarter of a minute till the wheel went over. I was endeavoring all the time to keep the horses in the line of the street. My family went over sideways, and the carriage backwards. There was no barrier. The rein was so entangled that it could not be extricated from the carriage. If I had been in there, I should have had to step out and do just as I did." The plaintiff further testified "that from the place where he stood to adjust the rein it was some twelve feet to the place where the hind wheel went off the bank."

The judge, being of opinion that the plaintiff could not maintain his action on these facts, by agreement of the parties withdrew the case from the jury and reported it to this court ; if the said facts would not sustain the action, the plaintiff to become nonsuit ; otherwise, the case to stand for trial.

*C. Delano*, (*J. C. Hammond* with him,) for the plaintiff.

*S. T. Spaulding*, for the defendants.

CHAPMAN, C. J. There can be no doubt that a traveller on the highway may stop his horse, alight from his carriage, and employ himself, while out of his carriage, in acts that have no connection with his journey or its purpose. *Babson* v. *Rockport*, 101 Mass. 93. Such a position and such employment, for a reasonable time, would not of itself deprive him of his rights as a traveller. Rests of such a character, during a journey, are common. They may be of such a character as to make it clear that the party has ceased to use the highway as a traveller , and when there is no evidence that the plaintiff is using it as a traveller, it is the duty of the court to take the case from the jury, as in *Stickney* v. *Salem*, 3 Allen, 374. So if there is no evidence that the plaintiff used due care, or had the control of his horse, or that the way was out of repair. But it appears to us from the report, that on all these points there was sufficient evidence to go to the jury. There was evidence of care, before the horses began to back ; and though the plaintiff appears to have lost control of

his horses, yet it would be competent to the jury to find, upon the circumstances stated, that it was only a momentary loss. There was also evidence that the want of a railing at that place was a defect. It is not necessary to consider whether the circumstances would satisfy the jury. It is only decided that the evidence is not so defective as to justify the court in taking the case from the jury.                    *Case to stand for trial.*

The case was tried again, and a verdict returned for the plaintiff with damages in the sum of $2000, before *Rockwell*, J., who allowed the following bill of exceptions :

" As evidence that he was in the exercise of ordinary care at the time of the accident, the plaintiff testified on all points in the case, and among other things that on August 6, 1870, he was going from Goshen to Lanesborough with his family, in a rockaway drawn by a span of horses which were sixteen hands high, heavy and high forward, and held their heads very high ; that he had had the horses fifteen months, and they were perfectly gentle, and though they were spirited any one could drive them with one hand ; that his wife could drive them ; that, by the side of the road where the accident occurred, he saw some very large red raspberries, and got out to pick them ; " and further as follows : " I stopped about the centre of the road, handed the reins to my boy, (who had often driven the horses and was physically and mentally the smartest boy I have at his age,) stepped out of the carriage and walked back to where these berries were — about a rod back of where we stopped. At this place, there was a stream on the left hand side and a high hill on the right. The road was level. After I had picked perhaps half a dozen berries, I heard my wife say ' Winchester.' I looked and saw everything was quiet, but, she having called me, I stepped two or three steps, when she said, ' Come quick, the horse's head is caught.' Then I started to run. I stepped in between the carriage and the stream, and when I arrived there I perceived that the nigh horse had caught in some way his head underneath the check rein of the off horse. These horses were more powerful than beautiful one six and one seven years old, quite high spirited. I do not

think my wife and boy had ever driven them without I or some one was with them. I had a man who used to drive out with the family, and I have seen him let them have the reins, the same as with me. I did not observe the slope of the embankment until afterwards. As I went along, I did not observe whether there was any railing. The raspberries were on the side of the road towards the stream. I took no notice as to a railing on the embankment. I noticed there was a stream below me, but the railing I thought nothing about before the accident. I did not know that the law required any railing. It was a pretty narrow road. The hill at the right, the original timber had been cut off; it was more or less woody, and the road was shaded somewhat by the hill and the shrubbery. I do not think it was warm for the season. The flies did not plague the horses, to attract attention. It is common for flies to plague horses in August. These horses were sensitive to flies, as all horses are."

" The plaintiff further testified, that at the time he reached the horses' heads they had not moved from their position; that, as he reached up to get the check rein off, the nigh horse reared a little, and he could not reach the rein, and from the tightening of the rein or some other cause the off horse then began to back; that he then seized the bits with both hands, and both horses began to back; that the forward wheels turned under the rockaway; that the horses, as he thought, did not back more than two or three feet before the hind wheels of the rockaway were going down the slope towards the stream; that there was a precipitous bank here of some eight or nine feet; that he thought he had stopped the first backing, but after the carriage had got on the slope it was the carriage that drew the horses back, and when he saw that the carriage must go over the bank he exerted himself to keep the horses at right angles with the carriage, so that when they should go off the bank they might not go upon the carriage; that the carriage went over squarely, and struck the bottom of the stream; that, about that time, the horses saw the bank and jumped and ' we all went over together; ' and that, had he been in the carriage himself, he must have got out in order to disengage the horse's head, and should have done just as he did do.

" Full instructions were given, in accordance with the opinion of the supreme judicial court in this case, on the question whether the plaintiff at the time of the accident was a traveller.

" The foregoing evidence of the plaintiff was all the evidence in the case, to show that he was in the exercise of ordinary care The defendants requested the judge to rule that the plaintiff upon his own testimony was not in the exercise of ordinary care ; that upon all the evidence in the case, as matter of law, he was not in the exercise of ordinary care ; and that the action could not be maintained. But he refused so to rule, and submitted the question whether the plaintiff was in the exercise of ordinary care, as a question of fact, to the jury."

These exceptions were argued by the same counsel at September term 1872, upon the single question of the sufficiency of the evidence for the jury on the question of the plaintiff's care.

BY THE COURT. There was evidence proper to be submitted to the jury, in the opinion of a majority of this court.

*Exceptions overruled.*