JAMES GULLINE, administrator, *vs.* CITY OF LOWELL.

Middlesex.    March 4. — May 10, 1887.    FIELD, C. ALLEN, & GARDNER, JJ., absent.

A child seven years of age, while walking in the evening beside his father along a plank sidewalk upon a bridge, prepared for travellers on foot, which a city was bound to keep in repair, stepped aside to clasp in sport a post forming part of the bridge and fell through a hole in the planking of the walk eleven inches square near the post, not known to either the boy or his father, into the water beneath, and was drowned. The father knew of the boy's intention to clasp the post, and did not forbid his doing so. *Held,* in an action against the city, under the Pub. Sts. *c.* 52, § 17, that it could not be ruled as matter of law that the boy and his father were not in the exercise of due care.

TORT, by the administrator of the estate of Robert Gulline, under the Pub. Sts. *c.* 52, § 17, for the loss of the life of his intestate on June 7, 1884, occasioned by an alleged defect in Central Bridge, over the Merrimac River, in Lowell. Trial in the Superior Court, without a jury, before *Blodgett,* J., who reported the case for the determination of this court, in substance as follows:

The judge found the following facts: There is in the city of Lowell a bridge across the Merrimac River known as Central Bridge, which the defendant is by law bound to keep in repair. There was a defect or want of repair in said bridge, as hereinafter set forth, and, by reason of said defect or want of repair, the life of said Robert Gulline was lost on June 7, 1884. The defendant had previous reasonable notice of the defect or want of repair; and, within the time required by law, due notice in writing was given to the defendant of the time, place, and cause of said loss of life, in which notice damages for said loss of life were claimed of the defendant.

The bridge is built of iron, four hundred and sixty-eight feet in length, with a roadway in the centre thereof thirty-two feet nine inches wide, and a footway on each side nine feet four inches wide, and six inches higher than the level of the roadway. Upon the outside, on both sides of the bridge, there is an iron fence about five feet high. Along the whole length of the bridge, in the sidewalks on either side, and within a few inches of the roadway, there are latticed iron columns about ten inches square, thirty feet in height, and placed at a distance of about twelve feet apart. From the top of each column to the bottom of the next column on the same side of the bridge were parallel diagonal iron braces about three fourths of an inch in thickness, five inches wide, and thirteen inches apart; and these braces ran through the planking of the sidewalk and connected with the columns under the same. Other than these posts or braces there was no obstruction between the sidewalk and the roadway. The flooring of the footways was of two-inch pine planking; and the space between the separate pairs of diagonal braces, placed at regular distances apart, was large enough for a horse and carriage to be driven from the roadway on to the footway. When the plank sidewalk was laid, where these braces went through the same, slots were cut into one side of the planks so that the same could be put down around the braces, and, upon three sides, between the two parallel diagonals comprising one set of braces, there was nothing to support the planking.

At a distance of seven inches southerly from one of these latticed iron posts, and on the west side of the bridge, where

two parallel diagonal braces (which were eleven and five eighths inches apart from each other) went through the planking to connect with the latticed iron pillar, by bolts underneath the planking, there was a hole in the planking of the bridge eleven inches square between the braces, which had been made by the breaking in of the planking. Through this hole the plaintiff's intestate fell into the river below, and was drowned. The hole constituted a defect or want of repair, of which the defendant had reasonable notice, as above stated, and this hole had existed at least for several weeks prior to the accident, and, in respect of this hole, the bridge was faulty in construction.

The plaintiff's intestate, who was seven years of age, and a bright boy for his years, resided with his father in a part of Lowell called Centralville, which was on the north side of the river, the city proper being situated on the south side, and the plaintiff had frequently passed over the bridge; and there was nothing to intercept the view of this hole except as herein stated, but neither the father, the mother, nor the son knew of any hole or defect in the bridge.

Upon the question of due care, the plaintiff introduced the following evidence, which was all the evidence introduced by him on this point.

He testified as follows: " On June 7, 1884, about eight o'clock in the evening, I was going home to Centralville with my wife, my little girl three years old, and my son Robert, who was seven years old. The little girl began to cry just before we got on the bridge, and wanted her mother to carry her. I said to the mother, ' You go on the other side of the bridge, and she will walk with me well enough.' The mother then crossed to the east side of the bridge and left me with the two children, the little boy on the right hand and the little girl on the left, on the sidewalk on the west side. Going over the bridge the little girl began to cry, and I said, ' Robert, go around the other side and take hold of the little girl's hand,' and he said, ' I will, father, but I will clip this post first.' (The post indicated was the one near the hole above described.) He did go, and I walked directly on, and looked around after going three or four yards, and there was no boy to be seen. I went directly home and found the boy was not there, and, after some conversation

with my wife, I went to look where I left the boy, and saw the hole."

Upon cross-examination, the plaintiff testified: " I have lived in Centralville for twelve months. The boy lived with me all the time. I crossed the bridge every day to work. The boy left me when I was about fourteen yards on the bridge. He had hold of my right hand. Said he wanted to ' clip the post,' or throw his arms around it, — call it hugging. The post is a latticed post, where the boys had been accustomed to climb. I was nearly opposite the post when he spoke of clipping it and left my side. I did n't see him any more. I did not glance about, but went three or four yards and looked around. I made no inquiry about the boy's disappearance. Saw no opening at that time. Went directly home. Arrived there between nine and ten o'clock. Waited some twenty minutes or more for my wife. I stayed in the house a half-hour, and then went to the hole, and then to the police station. At the entrance to the bridge there is an electric light, and another electric light a short distance from and nearly over this hole."

The father made no objection to the boy " clipping " the post, though he knew the boy intended so to do. Between the time when the boy let go the father's hand, and the time when the father looked around, the boy went through the hole in the bridge.

Upon this evidence, and upon the facts found by the judge as hereinbefore stated, the defendant asked the judge to rule that the plaintiff's evidence was insufficient in law to show the due care required to maintain the action; and that there was no evidence of due care on the part of the plaintiff, or of his intestate, or of those in charge of the intestate. The judge declined so to rule; and found for the plaintiff, and assessed damages in the sum of $500. If, as matter of law, the judge should have ruled as requested by the defendant, judgment was to be entered for the defendant; otherwise, judgment for the plaintiff on the finding.

*W. F. Courtney*, for the defendant.

*G. F. Richardson*, for the plaintiff.

W. ALLEN, J. The only question in these exceptions is, whether the court erred in refusing to rule that there was no

evidence of due care on the part of the plaintiff or of his intestate. There was evidence of the conduct of the parties, and that is evidence upon the question of due care. There was certainly direct evidence tending to show that, until the boy left his father's side, an instant before the injury, both were in the exercise of ordinary care, and from which, unless controlled by other evidence, a jury might have inferred that there had been no negligence on the part of either of them. The manner and circumstances in which the plaintiff's intestate left his father's side form part of their conduct, and of the facts from which their care or negligence is to be inferred, unless they were of such a character as to be obviously and necessarily inconsistent with ordinary prudence.

The court cannot say, as matter of law, that for a boy seven years of age to step aside and clasp a post he is passing, or for his father, in whose care he is, not to forbid him to do it, was negligence. A jury would be justified in finding that, under the circumstances, they were acts natural and to be expected in boys and their fathers of ordinary prudence.

It is argued that the boy was making an unlawful use of the highway, and that the father was negligent in allowing it; and several cases are cited where persons injured were debarred of their remedy because making a use of the highway for which it was not intended, but, as applied to the case at bar, they afford very little aid to the defendant.

It was decided in *Blodgett* v. *Boston*, 8 Allen, 237, (which is affirmed in *Tighe* v. *Lowell*, 119 Mass. 472,) that a boy using the highway solely for the purpose of playing could not recover of the city for an injury caused by a defect in the way. But the court said: "We by no means intend to say that a child who receives an injury caused by a defect or want of repair in a road or street, while passing over or through it, would be barred of all remedy against a town merely because, at the time of the occurrence of the accident, he was also engaged in some childish sport or amusement. There would exist in such a case the important element that the person injured was actually travelling over the way. But this element is wholly wanting in the case at bar. We have here the naked case of an appropriation of a portion of a public street to a use entirely foreign to any design or

intent to pass or repass over it for the purpose of travel within the meaning of the statute. It is to this precise case that we confine the expression of our opinion."

In *Lyons* v. *Brookline*, 119 Mass. 491, it was held that a child could not recover, who, while sitting playing upon the sidewalk, was injured by the act of a third person.

In *Stickney* v. *Salem*, 3 Allen, 374, it was held that a person could not recover for injuries caused by the breaking of an insufficient railing, occasioned by his leaning against it, while lounging upon a sidewalk.

In *Britton* v. *Cummington*, 107 Mass. 347, the plaintiff recovered for damages to his carriage and horses, although he had left his carriage and was engaged in picking berries by the side of the road. The court say, "There can be no doubt that a traveller on the highway may stop his horse, alight from his carriage, and employ himself, while out of his carriage, in acts that have no connection with his journey or its purpose. Such a position and such employment, for a reasonable time, would not of itself deprive him of his rights as a traveller."

In *Hunt* v. *Salem*, 121 Mass. 294, a boy, on his way home, crossed the street to look at toys in a shop window, and stood looking at them four or five minutes, and was injured as he turned away to resume his walk. It was held that he could recover.

In the case at bar, the boy was a traveller, and did not cease to be one when he stepped aside for an instant to clasp in play a post in the highway, and almost in his path. The act was a natural and ordinary incident of travelling.

*Judgment for the plaintiff on the finding.*