CATHERINE TIERNEY, administratrix, *vs.* BOSTON ELEVATED RAILWAY COMPANY.

Middlesex.     November 10, 1913. — January 8, 1914.

Present: RUGG, C. J., HAMMOND, LORING, BRALEY, & DE COURCY, JJ.

*Negligence,* Street railway, In use of highway. *Evidence,* Weight, Contradictory statements of witness. *Witness,* Contradictory statements.

Evidence, that a motorman operating a street railway car before five o'clock on a very foggy and dark morning in October, as he approached a street light on a corner of two intersecting streets, where it was usual for the cars to diminish their speed and where a man who had started to cross the tracks to board the car at a white post was in plain sight within the range of the light on the corner and the range of the headlight of the car, continued to run the car at the rate of forty miles an hour until it struck and killed the man before he cleared the last rail of the track, warrants a finding that the motorman was negligent in the way he operated the car.

Where a witness on his direct, on his cross and on his redirect examination tells a certain story as to the happening of an accident three times in the same way, and once upon his cross-examination and once upon his recross-examination tells the story twice in another way, which contradicts the first, it is for the jury to choose between the contradictory statements of the witness, unless by reason of the inconsistency of his testimony they decide not to give credit to it at all.

LORING, J.   In this case a verdict was directed in favor of the defendant on the evidence introduced by the plaintiff.†   The

---

† The verdict was ordered by *Hitchcock,* J.; and the plaintiff alleged exceptions.

action was brought to recover for the death of Lawrence Tierney. Tierney left his home on the day he was killed and went to the corner of Park and Salem Streets in the city of Medford, to take an outbound car to go to his work. He waited in the doorway of the apothecary shop shown on the plan, until the car he was to take had left Court Street some seventy-five yards west of Park Street. When the car which he was to take had left Court Street, Tierney started to cross the tracks to board it on the front plat-

form at the white post east of Park Street, eighty or ninety feet from the bakery. As he came to the "outgoing rail going to Boston" he was hailed by one Harrington, who called to him that he had got to "brace up" if he wanted "to get over." Thereupon Tierney walked faster, and Harrington thought that "he got across the track all right," but he was struck and thrown on the further side of the further or outbound track. His body was lying some fifteen feet to two car lengths behind it when the car was brought to a standstill. He was killed at five minutes before five o'clock in the morning of an October day. There was evidence that it was very foggy and very dark at the time of the accident.

There was also evidence that the car in question usually slowed down opposite the light shown on the plan on the westerly corner of Park Street, but that on the morning in question it was running at the rate of forty miles an hour and did not diminish its speed

until it stopped with a "terrific noise of grinding," when it struck the plaintiff's intestate at about opposite the white post on the easterly side of Park Street.

On this evidence the jury were warranted in finding that the motorman was negligent in the way in which he ran the car. It could be found that although the intestate was in plain sight, within the limits of the light on the corner of Park and Salem Streets and of the headlight of the car in question, the motorman ran his car at forty miles an hour until it ran into and killed the intestate.

Whether the intestate was guilty of contributory negligence depends upon the view which the jury were justified in taking of the testimony hereinafter quoted, given by Harrington.

It appeared that on the morning in question Harrington and the intestate had waited in the door of the apothecary shop for their respective cars which they took each morning to go to their work. On direct examination Harrington testified that the car was at the bakery when Tierney reached the outside rail of "the track on which he was killed." On cross-examination he repeated this testimony; on being asked: "When Mr. Tierney was on the first rail of the track upon which he was injured, did I understand you to say yesterday that the car then was back on the other side of Park Street?" and he answered "Yes." But on being cross-examined further and in connection with the plan, he testified in answer to the question, "Now then, when he was about to go on to the first rail, that one there (indicating), where was the car, how close to him?" Harrington testified that it was "right on top of him, . . . about five or six feet" away. This was repeated; and when he was asked, "So that any question which may have been put in a different way and you made a different answer you did not understand the question," he said that he did not. On redirect examination the witness testified as follows: "Q. Now where was Mr. Tierney when the car was at the bake shop? A. About six feet from the other rail. — Q. That is, from the rail on which he was hit? Is that the rail you mean? A. Yes. — Q. And then where was the car when Mr. Tierney finally touched the first rail on which he was hit? A. Well, I should say the car was at the bakery." When the witness was again taken in hand by counsel for the defendant on recross-examination, he gave the

following testimony: "Q. Now, then, at the time when Mr. Tierney was stepping from a point of safety, the outside rail No. 2, into the danger place on No. 3? A. Rail 3. — Q. At that time the car was within five or six feet of him? A. Yes, sir. — Q. That is true? A. Yes, sir. — Q. No mistake about it in any way, shape or form, is there? A. No, sir." And this he repeated; and in answer to the question, "That is what you mean?" he said, "Yes," and to the further question, "No question about it at all?" he answered "No."

It appears therefore that the witness three times (once on direct, once on cross and once on redirect examination) told one and the same story, and twice (once on cross and once on recross-examination) told another story which contradicted it. Under these circumstances it cannot be said that the second rather than the first of the two stories was the way in which the witness left his testimony. In other words this case is not a case like *Tupper* v. *Boston Elevated Railway,* 204 Mass. 151, *O'Neil* v. *Lynn & Boston Railroad,* 180 Mass. 576, and the case put by Holmes, C. J., in *Cameron* v. *New England Telephone & Telegraph Co.* 182 Mass. 310, 311, but is the ordinary case where the jury must choose between contradictory statements of the witness, as in *Lury* v. *New York, New Haven, & Hartford Railroad,* 205 Mass. 540, and *McCarthy* v. *Boston Elevated Railway,* 208 Mass. 512, or possibly by reason of the inconsistency in his testimony the jury were warranted in not giving credit to it at all, as suggested in *Eustis* v. *Boston Elevated Railway,* 206 Mass. 143.

*Exceptions sustained.*

*J. J. Cummings,* (*H. J. Dixon* with him,) for the plaintiff.
*P. F. Drew,* for the defendant.