THOMAS TANNIAN, administrator, vs. INHABITANTS OF
AMESBURY.

Essex.    November 5, 1914. — November 24, 1914.

Present: RUGG, C. J., HAMMOND, SHELDON, DE COURCY, & CROSBY, JJ.

*Way*, Public: defect in highway.    *Bridge.    Negligence*, Of child, Of parent.

It is the duty of a town, which maintains a bridge as a part of one of its prin-
cipal streets, over which children pass in going to and returning from school, to
maintain railings at the sides of the bridge that will make it safe and convenient
for all travellers including children; and, if the town allows a hole in such a
railing, through which children may fall, to continue to exist after reasonable
notice of its existence, this can be found to be a breach of the duty of the town
which makes it liable under R. L. c. 51, § 17, for the loss of life of a child who
fell through the hole while passing over the bridge as a traveller.

A boy about three years and eight months of age, who on his way home is passing
over a bridge that is a part of a highway of a town, can be found to be a travel-
ler on the highway in spite of a slight or momentary diversion from his main
purpose of going home.

A boy about three years and eight months of age, who fell through a hole in the
railing of a bridge that was a part of a highway of a town, and whose move-
ments before the accident are shown, can be found on proper evidence to have
been in the exercise of the care to be expected from one of his age; and it here
was not contended that the father of such a boy was negligent in allowing him
to go upon the street under the circumstances shown by the evidence.

TORT under R. L. c. 51, § 17, against the town of Amesbury
by the administrator of the estate of Thomas M. Tannian for
the loss of life of the plaintiff's intestate on June 22, 1911, when
he was three years, seven months and twenty-six days of age,
from being drowned in the Powow River, by reason of the
alleged want of a sufficient railing to the bridge which crosses
that river as a part of Pond Street, a public highway in that
town.    Writ dated September 16, 1911.

In the Superior Court the case was tried before *Bell*, J.    The
facts which could have been found upon the plaintiff's evidence
are stated in the opinion.

The plaintiff was a blacksmith and had his shop on Pond
Street at the edge of the west bank of the river at the end
of the bridge, and his residence was on the opposite side of the

river, distant about four minutes' walk from the shop. The
plaintiff had three other children older than the intestate, one of
them being ten and another twelve years of age, who attended
a school situated on the west side of the river and who, in going
to school, had to cross the bridge and pass by the plaintiff's shop.
The bridge was a stone arch with wooden picket fences or rail-
ings on both sides, the pickets being nailed to wooden stringers.
The intestate was accustomed to come sometimes to the plain-
tiff's shop, at times alone and oftener with the other children
when they were on their way to school, and the intestate would
spend his time with the plaintiff until the children came out of
school. On the day of the accident at about a quarter past eleven
a man came to the shop to have a shoe tightened on his horse,
and the intestate was with the plaintiff then. The plaintiff took
the tool box out of doors and put a nail in the shoe, and in the
meantime the scholars came running down the sidewalk and the
intestate crossed over and the plaintiff looked over and saw him
on the bridge.' That was the last he saw of him. The plaintiff
just had laid the tool box down at the door, when a boy came to
him and told him that there was a boy in the river. It did not
seem to the plaintiff to have been more than fifteen seconds or
so after he saw the intestate on the bridge.

A boy named Moorehouse, nine years of age, who was called
as a witness by the plaintiff, testified that he and seven or five
other boys were on the bridge when the accident happened, that
he had a bow and arrow and was pointing the arrow toward an
old barn, trying to put it through the window, and that he saw
the intestate come on the bridge from his father's blacksmith
shop, that as the witness was aiming the arrow he saw the intes-
tate about twelve feet from him and near the place where the
pickets were out of the fence or railing of the bridge, and that,
after the witness had pointed the bow and arrow the intestate
"leaned up against the fence, and then was going to his father's
shop, and walked right through the fence, through the pickets,"
that the intestate fell backward through the open space, that
the witness had noticed that the pickets were out before that day
and had fished through the hole there on three different days
which were not "three days running."

On cross-examination this witness testified that, of the seven

or five other boys on the bridge, one named Joe was fishing and the other boys were in a row looking down to see whether Joe was catching any fish, that the intestate was peeking through the fence, and that he had been playing around there, sitting in the gutter in one place, and that he sat there about five minutes. Being asked the question, "Then he got up from the gutter, did he?" the witness answered, "He was right over there [indicating the place upon a photograph], and I had the bow and arrow pointed down to the window, and he slid from there to there, and there is where the two pickets were out, and he went through."

A boy named Murphy, about seventeen years old, who was on the bridge, testified that the accident happened between a quarter past and half past eleven o'clock, that the boy fishing was about a foot from where the intestate fell in, that the witness just looked over the fence once to see the boy fish, that "then a team came by and I noticed this little fellow a kind of backed up and I didn't see him again then till I heard the splash. The last I saw him he was about a foot from the hole in the fence." He further testified that just after the intestate fell in he "noticed there was a kind of a large space there . . . about a foot and a little over."

A witness, named Melia, thirty-three years of age, testified that "three days, if not four," before the accident he "noticed that there were pickets off the fence," and, being asked how many pickets he saw off, answered, "Well, I wasn't positive whether there was two or not, but I know there was quite a space where there were pickets off. There might possibly have been two, but I am quite positive there was one."

Another witness, named Ouilet, fourteen years of age, testified that three or four days before the accident he saw a boy pull a picket off the railing of the bridge.

A boy named Grady, fifteen years of age, testified that four or five days before the accident he was on the bridge when a fire engine was tried there, and that the hose was drawn through the hole in the fence of the bridge where the pickets were off, and that this hole was probably eight or ten inches wide, that he noticed the hole again after the accident and that, "there was a space there where the pickets were off. . . . There was one off anyhow, and there was space enough for two pickets."

At the close of the plaintiff's evidence the defendant rested

without calling any witnesses; whereupon the judge ordered a verdict for the defendant, and reported the case for determination by this court.   If the ordering of the verdict was wrong, judgment was to be entered for the plaintiff in the sum of $500; otherwise, judgment was to be entered for the defendant on the verdict.

*J. P. Sweeney,* for the plaintiff.

*H. J. Cole,* for the defendant.

SHELDON, J.   While the question is not free from doubt, we are of opinion that the jury could find that there was a defect or want of a sufficient railing on this bridge.   They certainly could find that a railing or fence was needed to make the bridge safe for travel.   It was a part of one of the principal streets of the town, a street by which children went to and from school.   They could find further that there was a hole in the railing through which children might fall; that the protection afforded to children was so much diminished by the existence of this hole as to make the bridge unsafe for them to travel upon; that the defect had existed so long that the officers of the town reasonably might be taken to have had notice of it, as well as of the fact that school children were accustomed to pass regularly over the bridge.   It was not unreasonable to require the town to keep the bridge safe and convenient for all travellers, both children and grown persons.

There was evidence to warrant a finding that the plaintiff's intestate was a traveller upon the bridge.   His main purpose, the purpose for which he went upon the bridge, was to go to his home.   A slight or momentary diversion from that main purpose, not being an abandonment of it, would not show decisively that he had ceased to be a traveller.   *Gulline* v. *Lowell,* 144 Mass. 491, and cases cited.   *Bliss* v. *South Hadley,* 145 Mass. 91. *Donohue* v. *Newburyport,* 211 Mass. 561, 569.   The somewhat contradictory testimony of some of the witnesses merely raised a question for the jury.   *Tierney* v. *Boston Elevated Railway,* 216 Mass. 283.   With the weight of the testimony we have nothing to do.

It could be found that the intestate exercised that degree of care which could be expected from one of his age.   There was sufficient evidence of his actions to avoid the difficulty found in *McCulloch* v. *Needham,* 217 Mass. 227.

It has not been contended that the intestate's father was negligent in allowing him to go upon the street under the circumstances testified to. That question hardly is raised by the report.

Upon both of the points upon which the ruling at the trial was made, the case comes near to the border line; but in our opinion the evidence made them issues for the jury.

Upon the terms of the report, judgment must be entered for the plaintiff in the sum of $500.

*So ordered.*