F. RAY COMSTOCK *vs.* BILTMORE AMUSEMENT COMPANY & another.
SAME *vs.* SAME.
SAME *vs.* SAME.

Suffolk.     March 26, 27, 1917. — May 25, 1917.

Present: RUGG, C. J., BRALEY, DE COURCY, CROSBY, & PIERCE, JJ.

*Contract,* What constitutes, Performance and breach.     *Practice, Civil,* Judge's charge.

In an action of contract by a theatrical manager, against another theatrical manager and the proprietor of a certain theatre, to recover $500 a week for the period of the production by the defendant manager of a certain play at the theatre of the defendant proprietor, in consideration of the plaintiff giving up his right to produce a certain play at that theatre on and after a certain date and thus permitting the play of the defendant manager to continue its successful run there, it was *held* that the evidence warranted a finding that in consideration of the plaintiff giving up his claim to the theatre the defendants bound themselves jointly to make the weekly payments during the run of the play.

In the action above described the defendants contended that their promise to pay $500 a week was conditional upon the plaintiff's complete withdrawal of his play and his not producing it at any theatre in that city during the period of payment, and it appeared that the defendants had stopped making the weekly payments upon the production of the plaintiff's play at another theatre in the city. The evidence on the question, whether the plaintiff agreed that his play should be withdrawn during the period for which he was to be paid, was conflicting, and it was *held,* that, whether the withdrawal of the play from performance in the city was a condition precedent to the defendants' obligation to pay the plaintiff $500 a week, depended upon the view that the jury took of all the evidence from which the terms of the contract were to be ascertained.

In the same case an exception of the defendant to a portion of the judge's charge to the jury in which he made use of the phrase "trade talk" was overruled on the ground that, while the expressions complained of might be somewhat misleading if standing alone, yet, when the charge was read as a whole and the expressions were viewed in their proper setting, it could not be said that the instructions were clearly erroneous.

THREE ACTIONS OF CONTRACT between the same parties, all for alleged breaches of the same contract, each action covering a different period of time, the plaintiff alleging in each action that he had a contract with the defendant Wilbur Theatre Company entitling him to the use of the Wilbur Theatre for the production of a play called "The Third Party" from February 22, 1915, for an

indefinite period, that the defendant Biltmore Amusement Company was producing at the Wilbur Theatre a play called "A Pair of Sixes" and desired to continue it beyond the date of February 22, 1915, and that thereupon the defendants, in consideration of the plaintiff giving up his rights to the Wilbur Theatre for an indefinite period beginning February 22, 1915, agreed to pay the plaintiff $500 a week so long as "A Pair of Sixes" should be produced at the Wilbur Theatre after February 22, 1915. Writs dated March 17, March 22 and April 23, 1915.

In the Superior Court the cases were tried together before *Hall,* J. The evidence is described in the opinion. At the close of the evidence the defendant Biltmore Amusement Company asked the judge to make, among others, the following rulings:

"1. On all the evidence the defendant is entitled to a verdict."

"4. There is no evidence of an agreement on the part of the defendants jointly to pay any sum of money."

"6. The Biltmore Amusement Company cannot, in this action, be found liable to' the plaintiff for $500 per week."

"8. On all the evidence the jury must find that the plaintiff agreed not to produce 'The Third Party' in Boston during the theatrical season going on in the first part of 1915."

The defendant Wilbur Theatre Company asked for the same rulings similarly numbered, except that in the ruling numbered 6 the name of the Wilbur Theatre Company was substituted for that of the Biltmore Amusement Company.

The judge refused to make any of these rulings, and left the cases to the jury with other instructions, which in part are quoted and described in the opinion. The bill of exceptions states that "Each defendant excepted to so much of the charge as permitted the jury to find the talk about not playing in Boston by 'The Third Party' trade talk." A part of the charge referring to this subject was as follows: "So, in this case, you have got to see whether or not the talk that was had and the talk that was ultimately had with respect to 'The Third Party' not playing in Boston was trade talk or was an essential consideration upon which this five hundred dollars was to move. That is the vital spot in this case, and that is a question of fact that is left to you to determine upon this evidence, and all of it, together with your experience as business men and the fair inferences and deductions

that you will draw from the kind of men who were trading, as to what kind of a proposition they were making, and that brings you to some consideration as to what the situation was in the Boston theatrical market, and here again there is no dispute as to what the conditions were here."

The jury returned verdicts against the defendants jointly, in the first case in the sum of $1,063.33, in the second case in the sum of $531.25 and in the third case in the sum of $2,114.66. Both defendants alleged exceptions.

*J. T. Hughes,* (*D. Harris* with him,) for the defendants.

*F. N. Nay,* for the plaintiff.

BRALEY, J. If not expressly conceded it is undisputed that under the contract between the plaintiff and the Wilbur Theatre Company, he obtained the right to present to the public at the Wilbur Theatre in Boston for an indefinite period beginning February 22, 1915, a play or drama known as "The Third Party," which he either owned or controlled, and of the gross receipts the Wilbur Company was to receive forty per cent, the remainder being retained by him. At the time this contract was made a prior contract dated June 16, 1914, had been entered into between the Wilbur Company and the Biltmore Amusement Company giving to that company the use of the theatre for eight weeks beginning December 28, 1914, during which a play owned by the Biltmore Company and called "A Pair of Sixes," was "to be put on the boards," the division of the gross receipts being on the same percentage as in the contract of the plaintiff. The Biltmore play being prior in time was duly presented, and the patronage of the public made the engagement so successful that as it drew to a close a prolongation of the period was deemed desirable by one Frazee, the manager of the Biltmore Company, and one Wilbur, the treasurer of the Wilbur Company. But, as this could not be accomplished unless some arrangement could be made with the plaintiff, negotiations to this end followed. It is at this point that the controversy begins. The defendants contend, that on the telegrams, letters and oral evidence the jury were not warranted in finding, as their verdict shows they found, that the joint contract declared on in each case had been proved. The question was one of fact for the jury under proper instructions. It could be found on the testimony of one Murry, to the admission of which

no exception was taken, that he was connected "with the Shuberts, the theatrical managers, as their booking manager," of whom "Lee Shubert was president of the Wilbur Theatre Company," and in which the Shuberts owned a half interest, and that "he had always done business in connection with the Biltmore Amusement Company with Mr. Frazee" its manager. Having first heard from Wilbur and Frazee "of a desire to continue the 'A Pair of Sixes' at the Wilbur beyond February 20, 1915," he wrote to Wilbur that Shubert had asked him " to take up with Mr. Comstock the matter of cancelling 'The Third Party' at the Wilbur Theatre, Boston," and "I think we could get him to do this if you agreed to pay him $500 a week between yourself and Mr. Frazee, this amount to be taken out of the gross receipts. I think Mr. Frazee will be willing to pay his share of this $500. If Comstock was not a client of ours, we might be able to cancel this time, but we cannot arbitrarily do so under the circumstances. Please wire me upon receipt of this, what you think of the proposition."

The relations between the defendant companies thus having been shown, and the defendants having admitted that the contract between them was for the use of the theatre in connection with "A Pair of Sixes," the contract itself was properly admitted in evidence. In the absence of proof of any by-law limiting the authority of the president of the Wilbur Company, or of its treasurer, to bind the company in the management of its business, on the telegrams passing between Murry and Wilbur, all of which were introduced without objection by the defendants, the jury would be warranted in finding that the terms for the extension of "A Pair of Sixes" proposed by Murry were accepted by the Wilbur Company, and on the plaintiff's testimony, that he acquiesced in and acted upon this proposal. But, as what had been done did not specifically bind the Biltmore Company, Murry further testified, and on his testimony the jury well could find, that he then "took the matter up at Mr. Frazee's office and gave them a new contract — that is, a new contract between the Biltmore Amusement Company and the Wilbur Theatre Company for the continued production of 'A Pair of Sixes' at the Wilbur Theatre after February 20, 1915," and that after several conversations with Frazee in which the matter was discussed the new contract was made. The plaintiff then offered this contract dated February 4, 1915, in

evidence. It was admitted properly. It is not contended that the vice-president of the Wilbur Company and Frazee as manager of the Biltmore Company were unauthorized to bind their respective companies. The jury properly could find that the contract embodied the result of Murry's negotiations with Frazee, for the instrument recites: "It is mutually agreed upon between the parties hereto that the sum of Five Hundred Dollars is to be deducted from the gross receipts every week during this engagement, which amount is to be paid to F. Ray Comstock, Manager of The Third Party Company, in consideration of his consenting to the cancellation of the contract he now has for his attraction at the Wilbur Theatre beginning Feb. 22, 1915." The jury further could find from Murry's evidence, that, after the agreement had been executed, "The Third Party" was cancelled with the plaintiff's assent, and that the new contract was forwarded to the manager of the theatre, and "a duplicate to Mr. Frazee" by whose company a check for $500 payable to the plaintiff's order was sent on March 9, 1915. And the parties agreed that "'A Pair of Sixes' played at the Wilbur Theatre up to and including the week ending May 29," 1915.

If during the course of a long and exhaustive cross-examination Murry may have made some statements at variance with his direct examination, his credibility was for the jury who could accept such parts of his testimony as they believed to be true. *Tierney* v. *Boston Elevated Railway*, 216 Mass. 283. It also appeared in the testimony of Murry that the telegram of April 17, 1915, was dictated, signed and sent by Frazee. But, Frazee having denied that he was present, the counsel for the plaintiff, after having admitted the statement to be true, asked him in cross-examination, "Do you mean to say, and do you want, in leaving your testimony in that way, to let this jury infer that that telegram was a faked up affair?" to which the witness answered that so far as he was concerned it must be; and added, that his "representative in his New York office was Mr. Hopkins. He did not know that Mr. Hopkins had sent that telegram." The question although excepted to was within the discretion of the court. *Jennings* v. *Rooney*, 183 Mass. 577.

A letter then was offered purporting to be signed by the Biltmore Company acting by Frazee, and addressed to the Wilbur

Company, the contents of which referred to the Comstock agreement. In view of Frazee's further evidence that this letter was signed by Hopkins, meaning, as the jury could say, that Hopkins was authorized to sign Frazee's name, and the testimony of Hopkins, that he had sent the telegram also purporting to be signed by Frazee and dictated the letter, we cannot say that the admission of the letter as having some bearing on the fairness and good faith of Frazee as a witness to which the evidence was limited, requires the granting of a new trial. *Maguire* v. *Pan-American Amusement Co.* 211 Mass. 22, 27. St. 1913, c. 716, § 1. The defendants' motion that the telegram and all of the evidence of Hopkins relating thereto be stricken from the record also was denied rightly. The telegram was introduced during the direct examination of Murry without exceptions being taken by the defendants. But, even if Murry subsequently corrected his testimony, that Frazee was in the office on that date, and the plaintiff's counsel expressly disclaimed that the Biltmore Company was bound by the telegram, yet the evidence of Hopkins, the defendants' own witness, as to his share in the transaction, and his lack of authority to act, elicited largely if not wholly on cross-examination, was admissible in the discretion of the judge as affecting his credibility as a witness as well as affording some explanation to be considered by the jury of the business methods of Frazee. *Jennings* v. *Rooney, supra, Maguire* v. *Pan-American Amusement Co. supra. Slotnick* v. *Silberstein,* 221 Mass. 59. St. 1913, c. 716, § 1.

If the plaintiff's testimony now is considered, the jury if they believed him could find, that he had several conversations with Frazee at Murry's office when Frazee said in substance that he wanted to stay at the Wilbur Theatre, and "after some arguments" the plaintiff said "he was willing to let him have the time for $500 a week as long as the 'A Pair of Sixes' played." To which Frazee agreed, and the plaintiff "gave up his claim to the Wilbur Theatre." It is plain the jury upon all the evidence could find that, having a unity of interest and for the purpose of their own mutual advantage and pecuniary gain, the defendants jointly made, and bound themselves to perform, the agreement. *Munroe* v. *Perkins,* 9 Pick. 298. *Meyer* v. *Estes,* 164 Mass. 457. Whether the contract was several as well as joint need not be

decided. The judge therefore rightly refused to give the defendants' first, fourth and sixth requests.

But, if the first question is disposed of, the defendants by the eighth request asked the judge to rule that on all the evidence the jury must find "that the plaintiff agreed not to produce 'The Third Party' in Boston during the theatrical season going on in the first part of 1915." Very plainly this request could not have been given in terms. It completely ignored the plaintiff's testimony, who testified that "no request was ever made . . . not to come into Boston with 'The Third Party,'" and in his cross-examination he denied in substance that any such arrangement ever had been made. It is true that the defendants introduced testimony to prove that the plaintiff did agree that the play should be withdrawn during the period for which he was to be paid, and that according to the plaintiff's evidence, Frazee having notified the plaintiff "that he would not pay $500 a week and that he would stop paying it from the moment" the plaintiff "opened 'The Third Party' in Boston, and he did stop paying it, and . . . has never paid anything at any time since." But whether the withdrawal of that play, was made a condition precedent to the contract declared on becoming operative, or whether the continuance of the play was a breach justifying rescission, depended upon the view the jury took of all the evidence from which the terms of the contract actually made were to be ascertained.

The defendants however excepted "to so much of the charge as permitted the jury to find the talk about not playing in Boston 'The Third Party' trade talk." But this phrase although used in the instructions is to be read in connection with the context. It was stated early in the charge when referring to and reading the contract as alleged in the declaration, "Now the defendant denies that, and as a part of his case he says another contract was made. The defendants have not got to prove that other contract. They simply offer that as evidence to show what the dealings of the parties were. They say that the whole contract upon which this consideration moved was not only to pay $500 a week by these defendants jointly to Mr. Comstock, so long as 'A Pair of Sixes' should run at the Wilbur Theatre, but that there was another essential, primary and bottom consideration in that contract, to wit, that Comstock agreed in consideration of that money that he

would not only give up his time at the Wilbur, but that he would not play 'The Third Party' in the city of Boston.  Now, if you shall say that the plaintiff in this case has not sustained the burden of proving the contract that he relies upon, there can be no recovery. The defendants have not got to prove what they say was the contract.  So you come right down in this case to the real bottom question, the first primary question, 'Was the contract made that the plaintiff relies on'?"  The judge then after fully referring to and reading parts of the correspondence said, " . . . you are now approaching the vital point in this case, as to whether or not the contract declared on by the plaintiff was the contract they made, or whether or not there was an additional primary factor in the case upon which the consideration moved, to wit, that Comstock would not play 'The Third Party' in Boston.  So, taking those letters and all the conversation up to this time, you have got to satisfy yourselves, if you can, . . . just what these men were undertaking to do, how their minds were working, the real undertaking, and open the experienced minds of these gentlemen and see what they were about."  In what followed the nature of the evidence, consisting of telegrams, letters, interviews and documents, and the object of the defendants which could not be accomplished unless the plaintiff for a monetary consideration could be induced to surrender his rights, were all impartially left to the consideration of the jury. And, after using an illustration of representations where the buyer is not deceived to which he referred as "trade talk," he gave an example of actionable representations, and continued, "Now, then, what do you say as to what these gentlemen were trading about?  If they were trading about what the plaintiff says they were trading, and no more, there has been an admitted breach of this contract up to a certain time.  There is no dispute about that.  If they were trading upon the basis of $500 a week for time at the Wilbur Theatre and 'The Third Party' not to come to Boston, there has been no contract proved here at all, and the defendants are entitled to a verdict."  No exceptions were taken to this succinct statement of the law applicable to the case, and the jury must have had no difficulty in understanding the exact issue.  While the expressions complained of may be somewhat misleading if standing alone, yet when the charge is read as a whole and they are viewed in their proper setting we cannot say

that the instructions are clearly erroneous. *Hogner* v. *Boston Elevated Railway*, 198 Mass. 260, 271.

The defendants having failed to show any error of law, the exceptions must be overruled.

*So ordered.*