COMMONWEALTH *vs.* OSCAR F. RUSS.

Suffolk.    November 14, 15, 1918. — January 23, 1919.

Present: RUGG, C. J., LORING, BRALEY, PIERCE, & CARROLL, JJ.

*Homicide. Evidence,* Circumstantial, Of motive, Confessions, Opinion: experts, Competency. *Practice, Criminal,* Conduct of trial, New trial. *Witness,* Cross-examination.

At the trial of a man for the murder of his wife, where the evidence was wholly circumstantial, the evidence in regard to the position and appearance of the body of the deceased and the surroundings warranted the jury in excluding as untenable the theory that the deceased committed suicide. All the evidence showed that there was no struggle preceding the death such as in reason would have been expected if any stranger had gained access to the tenement where the woman was killed and it could have been found that only a person known and trusted by the deceased could have committed the homicide, that no one entered the tenement from the time the defendant left it in the morning to go to his work until he returned at night and the dead body of his wife was found, and that the deceased did not leave the tenement during that period. The facts revealed by the autopsy and by a chemical analysis of the contents of the woman's stomach pointed unmistakably to the commission of the deed before the defendant left the tenement in the morning. There also was evidence of previous trouble between the defendant and his wife, that both of them had been drinking beer and wine the day before and that when, after his work on the following day, the defendant returned at night he waited about two hours outside the house before attempting to enter. There also was evidence of behavior of the defendant indicating indifference upon the disclosure of his wife's death and of contradictory statements made by him to the police. The jury returned a verdict of guilty of murder in the second degree. *Held,* that it could not be said that the facts proved might not reasonably have

been found by the jury to be irreconcilable with the innocence of the defendant and not to be conformable to any theory other than his guilt; and accordingly that the verdict was warranted.

At the trial above described the judge made a preliminary finding that certain statements made by the defendant to police officers were admissible in evidence as voluntary statements. In the absence of the jury one police officer testified to the circumstances under which the statements were made by the defendant. He testified that they were made at the police station in the morning after the defendant had been arrested and again at midnight of the same day, that on the first occasion the defendant was asked a few questions about his relations with his wife and that on the second occasion the conversation was taken down by a stenographer and the defendant was informed seasonably and correctly of his rights and in reply had said, "I will tell you all." Thereafter the defendant testified in his own behalf at the preliminary hearing, contradicting the testimony of the police officer in important particulars. He testified in chief, on cross-examination and in redirect examination, and, although the judge interrupted his redirect examination to say that he was satisfied that the statements attributed to the defendant were made by him voluntarily and without duress, threat or promise, it did not appear that the defendant did not have an opportunity to testify as fully as he desired. *Held*, that there was nothing to indicate that the defendant had not been accorded a full and fair hearing or that his rights had been in any way impaired.

*Held, also*, that the judge in making his preliminary finding admitting the defendant's statements to the police officers would have been warranted in believing only the testimony of the police officer where it was in conflict with that of the defendant.

*Held, also*, that the preliminary finding of the judge was fully warranted.

In the same case it was *held*, that statements of the defendant to the police officers that he had had trouble with his wife and on one occasion had said to her, "You shut up or I will kill you" and that then "I went up to her with the knife. She fell on the bed and I walked away again," and also that he said, "One time, I was only fooling. I took a knife to her," combined with evidence that there was a scar on the woman's breast of a deep wound that had been healed about two or three months, were admissible as tending to show ill will of the defendant toward his wife as a motive for his crime.

In the same case it was *held* that the presiding judge was right in refusing to instruct the jury that these statements of the defendant, if made, were not an admission of guilt; because, although manifestly the statements did not purport to be a confession, yet they had a bearing on the question whether the defendant was shown to have had a motive to get rid of his wife, and the judge properly had instructed the jury to this effect.

In the same case it was *held* that expert testimony was competent to show whether the death of the defendant's wife was due to strangulation or hemorrhage.

In examining an expert witness it is not necessary always to make use of a hypothetical question. It is permissible to ask an expert witness, whether he has formed an opinion from his observations and examination and from testimony heard in court as to the point in issue about which he is qualified to give evidence, and, upon his answering that he has formed such an opinion, he may be asked to state it. The direct examination then may stop, leaving the witness to be cross-examined as to the grounds on which he bases his opinion.

Principles controlling the proper examination of expert witnesses stated by Rugg, C. J.

In the case above described, it was *held,* that an expert witness, who was a medical examiner of great special knowledge and experience, after having testified without objection, that the death of the defendant's wife "was caused by compression of the neck from two tightly drawn and knotted ligatures, one outside of the other, with consequent asphyxia, or by this cause plus an incised wound of the throat with resulting hemorrhage," properly might be allowed also to testify to the effect that no struggle took place on the part of the deceased while the ligatures were being tied and her throat cut, and that death occurred where the body was found.

Whether a witness should be required on his cross-examination to answer a certain question categorically, yes or no, is ordinarily a matter within the discretionary power of the presiding judge, as it was *held* to be in the present case.

In the case above described the defendant had testified that while he was making his statement to the police officers a piece of paper had been put before him and he had been induced to sign it. This had been denied by the police officers. It was *held* that it was competent for the presiding judge to allow the only pieces of paper then in the room where the defendant made his statement, which were of a different character from that described by the defendant, to be introduced in evidence for the purpose of showing that the defendant had not signed them, although otherwise they were completely immaterial.

Moreover, the pieces of paper above described had been found in the room with the body of the deceased, and it was *said* that it was competent to show what they were as bearing on the inquiry whether any person other than the defendant had been there on the day of her death.

The fair limits of the cross-examination of a witness are within the discretionary control of the presiding judge.

In the case above described it also was *held* that, after a witness had been permitted to testify in detail as to the facts relating to the conduct of the deceased, there was no error in the exclusion by the presiding judge of the question, whether the deceased "seemed to take any interest in her housekeeping," this question calling for an inference founded on simple facts which ought to be narrated in evidence, leaving the jury to form their own opinion.

In the same case the witness last referred to was asked, whether she ever had heard of the deceased "having been cut with a knife," and answered, "No." This evidence, which was immaterial and incompetent, was received without objection. The district attorney then cross-examined this witness, and, subject to the defendant's exception, she was allowed to testify that two persons had told her that there were two scars by cuts on the breast of the deceased. *Held,* that the defendant's exception must be overruled, because it was within the discretion of the presiding judge to determine to what extent the contradiction of immaterial evidence should be allowed.

In the same case it was *held* that the presiding judge rightly excluded evidence offered upon the question whether the deceased was talkative or self-contained, this not appearing to be relevant to any issue on trial.

In the same case, at one point of the cross-examination of the defendant, the district attorney held in his hands a book which he opened and looked at, but did not show to the witness or to the jury while asking questions as to the ability of the witness to draw pictures with a pencil, and it was argued

for the defendant that this was a piece 'of acting for the purpose of indirectly instilling into the minds of the jury the notion that the defendant was an erotic pervert or generally depraved in mind.  But there appeared to have been only a few questions wholly preliminary in their nature, which were not followed up and which, as they were left, seemed to have been quite colorless and unprejudicial, and it was *held* that the rights of the defendant were not impaired.

In the same case evidence of the fact, that the defendant had been at the station house before his arrest for murder, was admitted on his cross-examination to show his general familiarity with the place and not to show bad reputation, evil character or previous criminal conduct, and it was *held* that the admission of the evidence was a proper exercise of the discretionary power of the presiding judge.

In the same case the cross-examination of the defendant was said to have lasted about three hours, but it did not appear that it was prolonged unduly or that it was devoted to provoking the witness into an exhibition of anger or to other prejudicial ends.  A part of it related to the reasons of the defendant for calling one and not others of his neighbors on the evening that the body of his wife was found by him after he had discovered, as he had testified, the death of his wife.  *Held,* that the course of the judge in permitting this cross-examination to be conducted could not be pronounced erroneous.

In the case above described the presiding judge denied a motion for a new trial, based on allegations that the verdict was against the law, the evidence and the weight of evidence and urged chiefly on the ground that the verdict of guilty in the second degree under the circumstances disclosed must have been a compromise verdict, and it was *held* that there was no error of law and no abuse of discretion in the judge's denial of the motion.

In the same case a motion was filed to set aside the verdict and grant a new trial on the ground of newly discovered evidence.  An affidavit in support of the motion disclosed evidence which, if it had been offered at the trial, would have been admissible and pertinent.  The judge denied the motion.  *Held,* that there was nothing in the record to suggest an abuse of discretion nor any error of law.

INDICTMENT, found and returned in the county of Suffolk on September 11, 1915, for the murder on August 23, 1915, of Emily Russ, the wife of the defendant.

In the Superior Court the defendant was tried before *Sisk,* J. Upon a motion of the defendant for a bill of particulars the Commonwealth filed the following:

"Now comes the Commonwealth and answering the defendant's motion for a bill of particulars says that the time of the alleged murder was August 23, 1915; the place was 178 Centre street in the city of Boston in said county and Commonwealth.

"The means by which said crime was committed were:

"1. By strangulation.

A. By human hand or hands.

B. By strings and ropes.

" 2. By cutting the throat of deceased with a razor. The hour said crime was committed was between midnight and twelve o'clock noon of August twenty-third, according to the best knowledge and belief of the Commonwealth, which is unable to specify more particularly."

The evidence is described in the opinion. At the close of the evidence the defendant moved that the jury be instructed to return a verdict of not guilty. The judge denied the motion. The defendant then asked the judge to give to the jury, among other instructions, the following:

" 1. Upon all the evidence the jury should return a verdict of 'not guilty.' "

" 3. The Commonwealth has not sustained this burden if it leaves you in doubt whether the death of Emily Russ occurred before or after 7:30 o'clock in the forenoon of August 23, 1915."

." 6. The Commonwealth is bound by its specifications and must establish to a moral certainty, excluding every other reasonable hypothesis, that the death of Emily Russ was caused by the defendant between twelve o'clock midnight of August 22, 1915, and twelve o'clock noon of August 23, 1915.

" 7. In considering the question of the defendant's guilt or innocence the jury should take into consideration the absence of any evidence of motive on his part to kill his wife."

" 10. The statement attributed to the defendant as having been made to the police is not an admission of guilt of the crime charged."

" 19. In determining the question of suicide the jury have the right to consider the evidence as to her mental and physical condition on the day that she died."

The attorney for the defendant in his closing argument, accounting for the cause of death, said that the night before Emily Russ died she had been melancholy and feeling miserable, and that she was sick and also homesick; that with intent to commit suicide she had prepared the ropes that were found around her neck; that one rope was the drying rope which she took from behind the stove in the kitchen, and that the other was a white cord which she took from the curtains in the front room; that she went into the front room and tied the ropes around her neck; that this caused her terrible pain and in trying to take the ropes off she

scratched her neck; that she then took the razor and cut her own throat and thus ended her life.

The judge did not give to the jury any of the instructions requested by the defendant which are quoted above, and in his charge gave instructions, to which "No exceptions were taken . . . except for the failure to give the instructions requested." The jury returned a verdict of "Guilty of murder in the second degree;" and the defendant alleged exceptions, including the exceptions to the admission of certain evidence which are described in the opinion.

The cross-examination by the Commonwealth of an expert in medical chemistry called by the defendant, which is referred to in the opinion, in regard to the effect of *rigor mortis*, is described in the bill of exceptions as follows: "The witness was also asked as to *rigor mortis* and declined to testify as to the time when this occurred, as he was not qualified, that he was testifying as a chemist, not as a pathologist, . . . The witness declined to express an opinion as to the *rigor mortis*, stating that he was not qualified to express an opinion on that subject; that well known authorities on that subject did not conflict with his opinion; that according to these authorities the possible inception of *rigor mortis* was from six to ten hours, and it may go as high as seventeen hours, under unusual conditions." The district attorney then proceeded to cross-examine the witness further on this subject, concluding as follows: "Q. Doctor, I don't want to pester you or tire the jury, and we both want to be fair with each other —— A. Surely. Q. Is this a fair statement: That you did not consider *rigor mortis* in reaching your conclusion as to the time of the death? A. No, sir. Q. Is that a fair statement? A. That is a fair statement. I am basing my opinion wholly upon my results. Q. And assuming that this was an ordinary case and that *rigor mortis* might have taken place from eight to twelve hours, that wouldn't change your opinion? A. Not at all in regard to the results obtained from my examination and tests. Q. Now, doctor, if it should be shown to you that *rigor mortis* occurred fifteen hours, in fifteen hours, would it affect your opinion? A. Not at all." The defendant's counsel then said, "One moment, if your honor pleases. There is no evidence in this case that *rigor mortis* occurred fifteen hours after the time of death." The district attorney then said, "I am testing

him." The judge then said, "I understand it is for the purpose of testing the witness."

*W. P. Murray*, (*M. Katzeff* with him,) for the defendant.

*A. C. Webber*, Assistant District Attorney, for the Common- wealth.

RUGG, C. J. The defendant was indicted for the murder on August 23, 1915, of his wife, Emily Russ. The jury returned a verdict of guilty in the second degree. It is strenuously argued in behalf of the defendant that there was no sufficient evidence to support a finding that her death was caused by the defendant. His contention is that there was no adequate proof that the crime of murder was committed at all, and that consistently with every established fact the deceased might have committed suicide, and that, even if there were the requisite degree of proof of the crime of murder, there was no ground for a finding beyond a reasonable doubt that the defendant committed that crime. A somewhat detailed examination of the evidence becomes necessary.

There was no direct and positive proof that the defendant committed the crime. The evidence was in this respect altogether circumstantial. The testimony in its salient features respecting physical facts is not much, if at all, in controversy. There is the utmost divergence of view as to the inferences which rationally may be drawn from them. It was conceded by the Commonwealth at the trial that the defendant could not be guilty unless it was shown that he committed the murder earlier than shortly after seven o'clock in the morning before leaving the home for his work.

The defendant and his wife, both young and natives of Russia, were not of the same race. The wife was an Esthonian and the defendant of Lettish and German stock, the two peoples generally not being friendly either in Russia or in the United States. The wife before her marriage was strong, healthy and of attractive appearance, but for some months prior to her death she lost flesh and was not so well. They had been married less than two years and had lived a part of the time with the family of the defendant's father, but, the wife and her mother-in-law not being happy together, the defendant and his wife left to live by themselves. In August, 1915, with their baby girl eleven months old, they lived in a tenement of three rooms on the first floor of a six-tenement wooden house in Roxbury. The front room was a parlor or sitting

room, back of which was the kitchen, and behind that a bedroom. The wife was last seen alive by any one except the defendant on the evening of Sunday, August 22. On that day the two had been at home until toward night and had drunk beer and wine. The deceased spent the evening with friends but returned home about ten o'clock, the defendant having remained at home. The defendant, a painter by trade, worked the usual hours of labor on Monday, August 23, leaving his home not far from seven o'clock in the morning. He carried his dinner. To his fellows and others on that day he appeared as usual and not under special stress or excitement. A little before seven o'clock in the evening he was seen sitting on the steps of the house by a man named Vollm, who occupied an upper tenement. The defendant said that he had been sitting there for about two hours and could not get into his apartment. Together they tried the doors. That of the front room was locked from the inside and the one into the kitchen also was locked, having a Yale lock which fastened the door when it closed. At Vollm's suggestion the defendant entered the bedroom through a window by pushing aside a screen. A few minutes later the defendant went upstairs and asked Vollm to come down as something had happened to his wife. Vollm went through the kitchen into the front room of the defendant's apartment and there found the cold and lifeless body of the wife stretched on the floor between a couch and table. The defendant was sitting on the lounge and took a box of cigarettes and lighted one and soon went out to get an officer. In about twenty minutes he returned. Police officers came, and the medical examiner. The latter made a thorough examination of the body of the deceased and all the surroundings, during a part or all of which the defendant sat smoking cigarettes. The clothing found on the body consisted of shoes and stockings, an undervest, a nightdress and kimono, the latter being partly over the face. A somewhat bloody open razor belonging to the defendant was lying on the nightdress, which bore no stain in the immediate vicinity. There was no trace of any struggle in the tenement. Its furnishings were in order. The kimono was gathered in an irregular mass about the neck. It was "pulled tightly under the arms in front as though the force causing this had been directed from behind at a level of about the shoulders and from below up." Save in these particulars the

scanty clothing upon the body was in perfect arrangement, and there were no traces of violence to her person except about the neck. The body was lying on its back with arms outstretched at a slight angle from the body, with palms upward. There was no blood on the hands, body or clothing of the deceased except about the neck and head and the upper parts of the clothing. Two small ropes or cords tied about the neck were similar to others in the tenement. There was unburned paper and other waste in the kitchen stove. An autopsy was performed by Dr. Watters, the associate medical examiner of Suffolk County, the results of which were described in great detail in evidence. He testified that just below the left breast bone was a Y shaped scar two inches long on its longest surface line, that the wound went down to the bone and was one half to an inch deep, and that it had been healed about two or three months. He testified that in his opinion death was due to asphyxiation and hemorrhage of the vessels of the neck, and had occurred from twelve to eighteen hours, possibly twelve to twenty-four hours, before his first examination, which was at a quarter past eight on the evening of August 23.

The contents of the stomach were examined by a chemist, who gave a minute description of what he discovered. He expressed the opinion that food had been "eaten not more than one hour prior to her death."

There was testimony from other tenants in the house that no sounds of struggle, disturbance or otherwise were heard in the tenement of the defendant on August 23. A collector testified that he knocked at the doors about eleven o'clock in the forenoon and received no response and heard no sound. He left his card under the door, which was subsequently found there by others. There were slight blood spots upon underwear of the defendant in the bedroom. The clothing upon the bed was very much tossed. The baby was upon the bed at night and apparently had been there from the death of her mother until after the tragedy was discovered, when she was taken by Mrs. Vollm. It did not appear that any one had heard any sound from the child during the day. The wife of the keeper of a baker's shop almost directly across the street from the tenement of the defendant testified that during the three weeks the defendant had lived there Mrs. Russ came each morning except Sundays to the shop to make purchases at

about six o'clock, being the first customer, but that she did not come at all on Monday morning, August 23.

It was not contended that any robbery had been committed in the Russ tenement. It did not appear that the deceased had any enemies, although there was evidence that she had driven from the tenement one man who attempted familiarity.

There was evidence from police officers to the effect that the defendant after his arrest had said that he had never had trouble with his wife, but that later he had said that he had had trouble with her when living with his mother, and that "in fooling" with her he had had a bread knife and that this was at a time when she had called him a "bum" and took him to task for drinking, and he had then said that if she did not stop he would kill her. He said that she had no scar on her breast.

The defendant testified at length in his own behalf that his wife arose, prepared his breakfast as usual on Monday morning, August 23, not eating until after he left, and that his parting with her was affectionate and that he did not enter the house earlier at night, thinking that his wife had gone out, and he was waiting for her return. The opinion evidence of the medical examiner and chemist was contradicted in important particulars by that of other expert witnesses called by the defendant, whose testimony tended to indicate that the deceased met her death a considerable period after the defendant left home in the morning.

The evidence is voluminous. We have made only a very summary statement of its most pertinent aspects. But all the evidence has been carefully scrutinized and is in mind in the determination reached. These facts and the inferences reasonably to be drawn from them in our opinion warranted the jury in excluding as untenable the theory that the deceased committed suicide. The conclusion would seem to be irresistible that the bloody razor upon the body of the deceased was the instrument with which was made at a single stroke the deep wound in the neck. It well might be thought incredible that the hand which caused such a wound should be unstained with blood. The position of the razor upon the body might be regarded as incompatible with the supposition that the deceased could have placed it there. Her hands and arms were free from stain. A razor might be considered an unusual weapon for a woman to use with such accuracy and effect. The

tightness with which the ropes or cords were found to have been tied about the throat, as manifested also by specific evidences of asphyxiation disclosed by the autopsy, might rationally be believed to preclude the idea that a person thus in process of strangulation could have possessed sufficient consciousness and strength to make such a wound with such an instrument and then place it in the position in which it was found, and finally cover her face with the kimono.

All the evidence at the trial warranted a finding that there was no struggle preceding the death such as in reason would have been expected if any stranger had gained access to the tenement and undertaken to overcome the woman in the way her assailant did overpower her, that only one known and trusted by the deceased could have committed the homicide under all the circumstances without indications of violent resistance, that no one entered the tenement from the time the defendant left in the morning until he returned at night, that the deceased did not leave it during that period and that all the facts revealed by the autopsy and the chemical analysis pointed unmistakably to the commission of the deed at a time before the defendant left the house in the morning. The previous troubles of the defendant with his wife and the reaction from the drinking of the day before, in the light of all their relations, may have been regarded as likely to produce an easily provoked and violent state of mind on his part on that morning. The conduct of the defendant after his return from work at night in waiting long outside the house, in not entering the bedroom through the window at once or soon, in not searching for his child, and his behavior after the disclosure of the death of his wife, together with his contradictory statements made to the police, all were circumstances which might be regarded as pointing significantly toward his guilt.

The true rule of law respecting the probative character of circumstantial evidence is well settled. It is that the circumstances must be such as to produce a moral certainty of guilt, and to exclude any other reasonable hypothesis; "that the circumstances taken together should be of a conclusive nature and tendency, leading on the whole to a satisfactory conclusion, and producing, in effect, a reasonable and moral certainty, that the accused, and no one else, committed the offence charged." *Commonwealth*

v. *Webster*, 5 Cush. 295, 319. *Commonwealth* v. *Goodwin*, 14 Gray, 55. *Commonwealth* v. *Annis*, 15 Gray, 197, 201. *Commonwealth* v. *Tucker*, 189 Mass. 457, 486. Guided by this rule, it cannot be said in the case at bar that the facts proved might not reasonably be found by a jury irreconcilable with the innocence of the defendant or not thought conformable to any other theory than his guilt. It was open to the jury to reach the verdict which they did.

Exception was taken to the preliminary ruling by the judge to the effect that statements made by the defendant to police officers after his arrest were admissible in evidence. The practice upon this matter is well settled in this Commonwealth. In the first instance the decision rests with the presiding judge. If he thinks the confession or statement was not voluntary, he excludes it and the matter is ended unless some question of law is saved and reserved. But, if he decides that it was voluntary, he admits it and then leaves the whole question whether it was voluntary, and, if found to be so, its probative weight, to the determination of the jury. The decision of course must be made by the judge on his own responsibility regardless of the circumstance that the same question is subsequently to be submitted to the jury. He cannot shift his burden upon the shoulders of the jury. It is not a matter of discretion, but for judicial decision. In passing upon an exception to the preliminary ruling to the effect that the statement was voluntary, the appellate court has only to determine whether there was any evidence to justify that decision. *Commonwealth* v. *Bond*, 170 Mass. 41. *Commonwealth* v. *Storti*, 177 Mass. 339, 343. *Commonwealth* v. *Killion*, 194 Mass. 153. *Commonwealth* v. *Richmond*, 207 Mass. 240, 246. It is the usual question of law whether there is any evidence to support a finding of fact and is governed by familiar principles. *Commonwealth* v. *Antaya*, 184 Mass. 326, 327. *Ames* v. *New York, New Haven, & Hartford Railroad*, 221 Mass. 304, 306. *McSweeney* v. *Edison Electric Illuminating Co.* 228 Mass. 563.

The course pursued in the case at bar was that in the absence of the jury one police officer testified to the circumstances under which the statements were made by the defendant. In brief, they were that at the police station in the morning following his arrest, and again at midnight of the same day conversations were had with him by officers of police. On the first occasion a few

questions were asked respecting his relations with his wife. On the second the conversation was taken stenographically and the defendant was seasonably and correctly informed as to his rights and in reply the defendant said, "I will tell you all." The effect of this testimony by the police officer was that all the statements of the defendant on both occasions were made freely without coercion on inducement. Thereafter the defendant testified in his own behalf at the preliminary hearing, contradicting in important particulars the testimony of the police officer. He testified at whatever length was wished in chief, and he was cross-examined. In redirect, it does not appear that he had not as full an opportunity to testify as was desired. Even though the judge interrupted the redirect examination to say that he was satisfied that statements attributed to the defendant were made by him voluntarily and without threat, duress or promise, there was no error. There is no suggestion that the examination had not covered all material matters. It does not appear that counsel for the defendant desired to make an argument on the admissibility of the statements. It is doubtful whether he could demand the right to argue such a matter under Rule 43 of the Superior Court, 1915. There is nothing to indicate that the defendant was not accorded a full and fair hearing upon this phase of the case.

It is not necessary to analyze the testimony given by the defendant, nor to determine whether standing alone it would be sufficient to support a finding that his statements all were voluntary. It is enough to say that the judge would have been warranted in believing only the evidence of the police officer where it was in conflict with that of the defendant, and in discrediting the testimony of the defendant. *Commonwealth* v. *Morris,* 1 Cush. 391, 394. *Commonwealth* v. *Hyland,* 155 Mass. 7. *Commonwealth* v. *McNeese,* 156 Mass. 231. *Commonwealth* v. *Corcoran,* 182 Mass. 465. *Lindenbaum* v. *New York, New Haven, & Hartford Railroad,* 197 Mass. 314. *Sullivan* v. *Old Colony Street Railway,* 200 Mass. 303, 309. *Giles* v. *Giles,* 204 Mass. 383, 385. The uncontroverted facts in *Commonwealth* v. *Bond,* 170 Mass. 41, were stronger toward the exclusion of the confession of the defendant than in the case at bar, and yet the confession there was held not to have been admitted erroneously. See, also, in this connection *Commonwealth* v. *Cuffee,* 108 Mass. 285; *Commonwealth* v. *Smith,* 119

Mass. 305, 311; and *People* v. *Stielow,* 161 N. Y. Supp. 599, affirmed without opinion, 217 N. Y. 641.

There is no substantial foundation for the contention that the judge failed to take sufficient notice of all the internal corroboration of the defendant's testimony in the evidence from the police, or that he acted in a perfunctory manner, or was otherwise than keenly sensitive to the special duty and responsibility resting on him. There was ample basis in the evidence for a genuine, unbiased and judicial conclusion that the statements made by the defendant were voluntary, and unconstrained, not extorted by threat of harm, nor wheedled by promise of favor. *Commonwealth* v. *Sego,* 125 Mass. 210, 213. *Commonwealth* v. *Myers,* 160 Mass. 530, 532. *Commonwealth* v. *Preece,* 140 Mass. 276.

Reference by the judge to his realization that the whole matter was to be submitted to the jury was a simple statement of his appreciation of the law in that particular and falls short of any indication of surrender of the judicial function.

One feature of the statements made by the defendant to the police officers as given in evidence by the latter, was that at the first interview the defendant said that he had never had trouble with his wife and had never cut her with a knife or stabbed her; while at the second interview he said that at times he had had trouble with his wife and once when she was complaining of his habits as to drink and otherwise, he said, "You shut up or I will kill you," and that then "I went up to her with the knife. She fell on the bed and I walked away again;" and that, in response to questions, he said, "One time, I was only fooling. I took a knife to her." At the trial the defendant testified in substance that he made such a statement because he was "scared" and his interrogator was quite "mad." There was testimony to the effect that at the autopsy of the deceased there was found upon her breast a scar apparently resulting from a wound made within two or three months, although there was some diversity of evidence between two witnesses called by the Commonwealth respecting its probable size and depth. Despite the denials of the defendant, the jury may reasonably have inferred some connection between the scar and his conduct. The testimony of the officers that the defendant grew pale, shuddered and almost swooned and made ejaculations about "those cuts" upon inquiry respecting his rela-

tions with his wife and his connection with her decease, might have been regarded as significant, if believed.

It is manifest from this summary that the statement of the defendant to the police officers considered as to its substance was admissible. It generally is competent to show that one charged with crime has made threats of harm to the one injured, or has maintained a course of conduct tending to indicate a settled ill will. Such evidence bears on a motive for the crime. It is not admitted for the purpose of showing separate and independent acts of wrongdoing, although these unavoidably appear in disclosing the course of conduct and possible motive. *Commonwealth* v. *Holmes,* 157 Mass. 233, 240. *Commonwealth* v. *Chase,* 147 Mass. 597. *Commonwealth* v. *Retkovitz,* 222 Mass. 245, 249. Where the inquiry relates to the relations between husband and wife the details may be somewhat minute. Standing alone, single incidents of slight significance may in connection with all the others have a bearing upon the existence of a feeling of hostility or other elements of motive. *Commonwealth* v. *Howard,* 205 Mass. 128, 148, 149. There was evidence coming from different witnesses of numerous incidents, each light in itself, the combined effect of which in conjunction with the statements made by the defendant might reasonably have been thought to be more than detached and unconnected matters and to tend to show a continued hostile purpose on the part of the defendant toward the deceased. See *Commonwealth* v. *Parsons,* 195 Mass. 560, 568.

There was no error in denying the defendant's request for an instruction to the jury to the effect that the statement attributed to the defendant by the police was not an admission of guilt. Manifestly it was not and did not purport to be a confession. The jury were sufficiently instructed that the evidence of that sort was to be considered in its bearing on the point whether the defendant was shown to have a motive to get rid of his wife. The rights of the defendant in this regard were adequately safeguarded.

Whether the death of Emily Russ was due to strangulation or hemorrhage was an issue at the trial. It was a subject about which expert testimony was competent. *Commonwealth* v. *Leach,* 156 Mass. 99. *Commonwealth* v. *Thompson,* 159 Mass. 56. *Commonwealth* v. *Spiropoulos,* 208 Mass. 71, and cases there collected. The correct practice as to the introduction of such testimony

is well settled. The competency of an expert witness to testify to his opinion rests upon unusual knowledge and extraordinary experience, superior to that of ordinary persons. The witness, being qualified in this particular, then may base his opinion upon facts observed by himself or within his own knowledge and testified to by himself, or upon facts assumed in the questions put to him and supported either by admitted facts or by the testimony of other witnesses already given or to be given at the trial, or upon facts derived partly from one source and partly from the other. It is not necessary in all cases that the facts be stated in the form of an hypothetical question, although this is generally permissible. Where an opinion is sought upon substantially uncontradicted testimony heard by the witness with or without personal observation on his part, the question may be asked upon that express or implied assumption without reciting the testimony in the question. Where there is conflicting testimony, a witness, who has been present in court and heard it, may be asked if he has formed an opinion as to a material point, respecting which his skill gives him requisite qualification to express an opinion, based upon that testimony or parts of it. If his answer is in the affirmative, then he may select and state the facts given in testimony which in his opinion, if true, are most significant and pertinent as aids in the formation of an opinion and to what conclusion his mind is led by the consideration of such facts. In the trial of a criminal or other case, it is permissible to ask an expert witness if he has formed an opinion from his observations and examination and from testimony heard in court as to the point in issue about which he is qualified to give evidence. Upon answering in the affirmative he may be asked to state that opinion. The direct examination then may stop, leaving the other side to develop the reasons in whatever detail may be desired.

The forms of question given in decided cases may not be exclusive of all others. It is essential, however, that in giving testimony the expert witness should not undertake to pass upon the truth of the fundamental hypothesis upon which his opinion rests unless the facts assumed are within his own observation and knowledge. He simply must assume those facts as the basis of his opinion. It is the province of the jury alone to decide whether those facts are established. If they are established in

substance to the satisfaction of the jury, then and not until then can the value of the expert evidence be taken up by them. If such facts are not so established, then the jury do not reach at all the consideration of the expert testimony. Manifestly an opinion not grounded either upon facts observed by the witness or upon facts assumed and specified in the question or upon facts in evidence through other witnesses, but based upon facts taken on the hearsay of others out of court and not in evidence and not put in the form of a supposition in the question, is not admissible in evidence. Such an opinion would or might well be founded upon facts, the truth of which could not in the nature of things be established to the satisfaction of the jury because no competent evidence respecting them would be before the jury. As to the order of introduction of evidence and the form of questions much must be left to the discretion of the presiding judge. *Woodbury* v. *Obear*, 7 Gray, 467, 471. *Hunt* v. *Lowell Gas Light Co.* 8 Allen, 169, 172. *Hand* v. *Brookline*, 126 Mass. 324, 326. *Anderson* v. *Albertstamm*, 176 Mass. 87. *Rafferty* v. *Nawn*, 182 Mass. 503, 507. *Commonwealth* v. *Johnson*, 188 Mass. 382. See Allen, J., in trial of Henry K. Goodwin, page 483. An expert witness cannot fortify his opinion by putting in evidence incompetent facts. *Commonwealth* v. *Tucker*, 189 Mass. 457, 479. *Commonwealth* v. *Sinclair*, 195 Mass. 100, 108.

Guided by these well settled principles, there was no error in the admission of the testimony of Dr. Magrath. Being an expert pathologist, to whose qualifications in that regard no objection was made by the defendant, he was called as a witness by the Commonwealth. He testified that he was one of the medical examiners for Suffolk County, visited the house where the death of Emily Russ occurred and was present at the autopsy, and that he formed the opinion that "death had occurred well into the second day previous to this time, that is to say, more than twenty-four hours or, roughly, thirty-six hours" before the time of the autopsy. "I formed that opinion there on the general appearances of the body; I was not relying on other facts or other opinion or other data at that time." This was unexceptionable. He based this opinion solely on his own observations. Then he gave as his reasons for this opinion certain observations made by himself, and stated further that he had received "certain other data from

Doctor Watters upon which he relied in making some closer approximation." He was never asked to give and never testified concerning this "closer approximation."

He then testified in substance that the "certain other data" were "information received from Doctor Watters as to the condition of the body when he first saw it, . . . the observation which he made as to rigidity and the temperature of the body." Thereupon objection was made on the ground that the question calling for opinion "ought to state the facts which it asks him to assume in stating his opinion." On the assurance by the district attorney that this question was merely preliminary, the judge, subject to the defendant's exception, denied his motion that this answer be stricken out. There was no error here because it is apparent that thus far the witness had given no testimony not founded exclusively on his own observations, which he either had or was ready to state in answer to questions. He merely intimated that as to more minute details not yet given by him in evidence he would depend in part upon the information conveyed to him by Dr. Watters.

The witness, then having said that he heard the testimony of Dr. Watters given on the day before respecting the matters on which he had relied, was asked this question: "How does that agree with the statement he made to you on which you partly based your opinion?" On objection, that question was withdrawn without being answered and this question asked instead: "What did Doctor Watters say to you regarding the rigidity of the body in the first examination, leading you to form the opinion which you expressed here to-day, or at least being part of the reasons upon which you based your opinion?" Objections being made, the judge ruled, "I think that, if objection is made, the objection should be sustained. I think that is hearsay. The opinion stands as given by the doctor, and what he based it on. You can, if you care to, interrogate the witness as to what he heard here this morning and yesterday afternoon, as to whether or not that was the same information furnished him by Doctor Watters on which he in part based his opinion. He sat in court here all day." Then this question was asked: "Doctor, you have heard the testimony of Doctor Watters yesterday and to-day, what do you say as to that testimony as you heard it here, whether or not

it influences or changes the opinion which you have expressed?" Objection was made to this question on the ground that instead of embodying the facts to be assumed by the witness in expressing his opinion it involved an assumption of the facts as understood by the witness, and that the question as understood by the witness and as understood by the jury might relate to different states of facts. The judge thereupon ruled: "The difficulty about it is, I sustained your objection to the talk between Doctor Watters and him on the ground, rightly I think, that it was hearsay; now, then, I suggested, and I think it is proper, for the district attorney to first call the witness' attention to the fact that he was here in the court and heard Doctor Watters' testimony; drawing his attention to that, he has further the right to inquire what portion he heard of Doctor Watters' testimony on which he based his opinion." This ruling was correct. The question was answered in the negative. There was no error in this. The only opinion thus far expressed by the witness in his testimony was the one which was founded exclusively on his own observations. This question, manifestly directing the attention of the witness to the testimony of Doctor Watters, in substance asked him to assume that it all was true and then to say whether the effect of all or any parts of that testimony was to change the view already expressed. By no fair intendment can it be construed to require the witness to pass upon the soundness of the opinions expressed or the truth of the facts stated by Doctor Watters.

This ended the examination so far as it related to the time when the deceased had died. The district attorney then abandoned the line of inquiry as to the time of death, and took up a quite different subject, namely the cause of death. The new line of inquiry was opened with a question for the opinion of the witness as to "the cause of this woman's death." Objection was made to this question on the ground that the opinion might be based on hearsay statements made by Dr. Watters. This colloquy ensued: "The Court. This has all been preceded by the qualification of this witness, medical examiner for the county of Suffolk, who has performed nearly four thousand autopsies and is familiar with this one. Now he is asked for his opinion. — Mr. Murray. That is not my point, your honor. My point is not that this witness is not capable of forming an opinion, or

that his opinion may not have great weight, but it is not made definite upon what facts that opinion is based. It may be, and it is very possible here in view of the way in which this question is led up to, that they may be based on hearsay testimony of Doctor Watters, that is, the statement of Doctor Watters to him. — Mr. Pelletier. I take it that is a matter for cross-examination. The opinion is not any good if based on hearsay. That is a matter for my brother to open up. — The Court. The question may be answered."

Of course the judge was not bound by this interjection of the district attorney. Having a moment before made a full statement of the correct rule of law, he was not required to challenge the correctness of argumentative and inaccurate remarks of the district attorney. He was not obliged to point out the inapplicability of the objection made by the counsel for the defendant. It is plain that the judge understood that this question was distinct from those which had gone before and related to a different subject. This question did not refer to the "closer approximation" as to the time of death respecting which he had earlier stated that he relied upon "certain data" from Doctor Watters. This question concerned the cause and not the time of death. The ground upon which this question was admitted shows that the judge rightly was thinking of the personal observations made by the witness as the basis of the opinion he was about to express. There was no occasion for making any further ruling. The judge had stated the correct rule of law. The question was direct and unequivocal in its nature. It was of a kind naturally to be put to a witness who had performed an autopsy. In form and substance it was not open to objection. Without pausing to discuss it, or the comments made by counsel respecting it, the judge ruled at once and rightly that it was competent.

The witness having answered that he had formed an opinion expressed that opinion in these words: "That death was caused by compression of the neck from two tightly drawn and knotted ligatures, one outside of the other, with consequent asphyxia, or by this cause plus an incised wound of the throat with resulting hemorrhage." Then followed this question and answer: "And on what do you base that, doctor? A. The opinion as to asphyxia resulting from constriction, in part on the evidence obtained from in-

spection of the body at the autopsy. As to the kind of constriction, by information and exhibiting of the appliances, ligatures. As to hemorrhage, I rely on the presence of a wound dividing certain blood vessels, on the condition of the internal organs, and on certain exhibits." No objection was made or exception taken to these last two questions or answers. No motion was made to strike out the answers. There was no error of law in this regard.

Dr. Magrath was allowed to express an opinion, together with his reasons therefor, to the effect that no struggle took place on the part of the deceased while the ligatures were being tied and her throat cut, and that death occurred where the body was found. The testimony shows that special knowledge respecting the position and manner of placing the ligatures and their effect upon physical functions formed the basis of the opinion. A physician's technical qualifications and unusual learning touching the effect of partial or complete strangulation and of hemorrhage might have been of material assistance in determining whether any self-defence preceded death. Such matters are outside the range of common experience and depend upon an exact and extended acquaintance with the human body and its vital faculties. It cannot be assumed that the knowledge of jurors is so varied or extensive that they would not be instructed and aided by testimony of this nature. *Commonwealth* v. *Spiropoulos*, 208 Mass. 71, 72, 73. *Harrington* v. *Boston Elevated Railway*, 229 Mass. 421, 428. The case in this respect is distinguishable from decisions like *Perkins* v. *Augusta Ins. & Banking Co.* 10 Gray, 312, and *Whalen* v. *Rosnosky*, 195 Mass. 545, where it has been held that the experience of the common man such as compose juries was a safer guide than expert testimony.

There was no error in the ruling that the witness Klemer need not be required to answer simply, yes or no, the question on cross-examination whether he did not know that the parents of the defendant "did take some interest in the child" of the deceased and the defendant. It is apparent from the course of his examination that the witness, a Lutheran minister, was strongly of opinion that activity exerted by them did not spring from a genuine interest in the welfare of the child. It was within the discretion of the trial judge whether the witness should be compelled to give

what might in the mind of the witness seem an equivocal answer because based without qualification upon direct affirmation or positive negation respecting a word susceptible of different meanings. The limits of cross-examination ordinarily rest in sound judicial discretion. *Commonwealth* v. *Coughlin,* 182 Mass. 558, 564. *Commonwealth* v. *Phelps,* 210 Mass. 109. *Gavin* v. *Durden Coleman Lumber Co.* 229 Mass. 576, 580. Reasonable cross-examination for the purpose of showing falsity of other testimony of the witness or bias and prejudice on his part is matter of right. *Day* v. *Stickney,* 14 Allen, 255, 258. *Commonwealth* v. *Wood,* 111 Mass. 408. *Snow* v. *Adams,* 200 Mass. 251. But the record does not disclose any error in this particular. The judge added, as a part of his denial of the defendant's right to insist upon an unqualified answer, that he was entitled to show anything not already developed to throw any light upon the bias of the witness.

There was no harmful error in the admission of pieces of paper found in the home of the defendant, upon which was writing in a foreign language. One was in the handwriting of the deceased in the Esthonian language, which the defendant could not read. The other was an undertaker's bill. Their contents appear to have no materiality to the issues raised, since neither of them relates to the defendant. *Moret* v. *George A. Fuller Co.* 195 Mass. 118, 124. The defendant, however, testified that while he was making his statement to the police officers, a piece of paper had been put before him and he had been induced to sign it. This was denied by the police officers. It was not incompetent to put in evidence the only pieces of paper which according to their testimony were shown to him while at the police station for the purpose of proving that he had not signed them. Moreover, these pieces of paper were found in the room with the body of the deceased, and their explanation had a bearing upon the inquiry whether some person other than the defendant had been there on the day of her death.

An expert in medical chemistry was called by the defendant, whose testimony differed in some material particulars from that of other witnesses. He had not been present at the autopsy, nor had he examined the remains or the contents of the stomach of the deceased, but based his opinion upon a study of the reports of the medical examiner and others who had made such examination.

He was asked in cross-examination whether in such a matter he would prefer, qualifications being equal, the opinion of one who had seen the body and performed the autopsy, or one whose information was derived wholly from a narration of facts by others. Construing the question critically, of course his preference was of no consequence. But a fair interpretation of the meaning of the question is that it was designed to elicit his opinion on the point whether facts derived from personal observation afforded a more reliable basis for an opinion than a written description of those facts. Such an inquiry is not directed to a comparison of the value of the testimony of divers witnesses, but to the very different end of ascertaining the best way to discover the facts on which to ground an opinion. Moreover, the answer to the effect that "being accurate, I would be equally satisfied with their report," was not harmful to the defendant.

A witness cannot be required to express an opinion as to the relative or absolute value of testimony from several experts either as compared with each other or with himself. The reliability of testimony from different sources cannot be magnified or disparaged in this way. Expert testimony cannot itself be made the subject of expert testimony. The weighing of evidence is within the exclusive province of the jury. The cross-examination of this witness did not transcend this rule. He was interrogated as to the grounds for a difference in the progress of digestion in the stomach of food eaten at different hours before observation. The examination as to the effect of *rigor mortis* did not exceed the fair limits of cross-examination in view of the knowledge of the witness.

There was no error in the exclusion of the question to Anna Russ whether the deceased "seemed to take any interest in her housekeeping." Easily observable facts capable of being accurately and fully stated in simple and intelligible words must form the foundation of any inference respecting such a matter. The facts ought to be narrated in evidence and the jury left to form their own opinion. *Noyes* v. *Noyes*, 224 Mass. 125, 129. Facts of that nature were stated in *Commonwealth* v. *Piper*, 120 Mass. 187. The witness was permitted in the case at bar to testify in detail as to the facts of the conduct of the deceased.

The same witness was asked by the defendant if she ever had

heard " of Emily having been cut with a knife." The answer was "No." This evidence was immaterial as well as incompetent, but no objection was interposed and it was received. The district attorney then cross-examined the witness respecting this matter and, subject to exception, she was allowed to testify that two persons had told her that there were two scars made by cuts on the breast of the deceased. It was within the sound discretion of the judge whether and to what extent the contradiction of immaterial testimony should be allowed. *Bennett* v. *Susser,* 191 Mass. 329, 330. *Commonwealth* v. *Wakelin,* 230 Mass. 567, 576. The decision in *Menage* v. *Rosenthal,* 175 Mass. 358, related to a different point.

The inquiry whether the deceased was talkative or self-contained does not appear to be relevant to any issue on trial and was excluded rightly.

At one point in the cross-examination of the defendant the district attorney held in his hands a book which he opened and looked at, but did not show to the witness or the jury while asking questions as to the ability of the witness to draw pictures with a pencil. Nothing was developed beyond an admission of very slight capacity in that particular and that line of inquiry was abandoned. It is argued that this was a mere piece of acting for the purpose of indirectly instilling into the minds of the jury the notion that the defendant was an erotic pervert or generally depraved in mind, when proof was utterly lacking or incompetent in form or irrelevant in substance. It goes without saying that, if the incident were justly susceptible of this construction, it would be the plain duty of the judge sternly to repress the line of inquiry and to take sedulous pains to remove every vestige of its effect from the minds of the jury. But the printed report conveys no such impression to our minds. There appear to have been only a few questions wholly preliminary in their nature, which were not followed up and which seem as left to have been quite colorless and unprejudicial.

Evidence of the fact that the defendant had been at the station-house before his arrest for the crime here charged was admitted simply in connection with his general familiarity with the place and not to show bad reputation, evil character, or previous criminal conduct. Nothing further than this appeared before the

jury. That fact did not of itself indicate that he had been arrested or went there involuntarily. It had a bearing upon the emotions, whether of fright or otherwise, which the defendant might have experienced in being taken there and in making his statement to the police officers. It cannot be held that this prejudiced the rights of the defendant by tending to show that he was of bad character or by violating the rule that cross-examination to affect a defendant's credibility cannot extend to transactions irrelevant to the issue on trial. *Commonwealth* v. *Schaffner,* 146 Mass. 512, 515. *Schmidt* v. *Schmidt,* 216 Mass. 572, 578. Much must be left in this connection to the discretion of the trial judge. *Jennings* v. *Rooney,* 183 Mass. 577, 579. *Comstock* v. *Biltmore Amusement Co.* 227 Mass. 146, 150.

The cross-examination of the defendant is said to have lasted about three hours. It does not appear that it was unduly prolonged or was devoted to provoking the witness into exhibition of anger or to other prejudicial ends. The part of it directed to the development of reasons for calling one and not others of his neighbors on the evening of August 23, after discovering the death of his wife, cannot be pronounced erroneous. The duty of the presiding judge is the heavy one of not permitting any unjust advantage to be taken by either side, and of seeing that there is a fair trial. While he ought to restrain frivolous, unfair or excessive examination of witnesses, on the other hand cross-examination must be allowed so far as reasonably likely to develop the truth. *Tildsley* v. *Boston Elevated Railway,* 224 Mass. 117, 119.

The defendant appealed from the order of the presiding judge denying a motion for a new trial based on allegations that the verdict was against the law, the evidence, and the weight of the evidence. The granting of a motion for a new trial rests in sound judicial discretion. That discretion cannot be reviewed by this court. *Simmons* v. *Fish,* 210 Mass. 563, 565, 572. *Commonwealth* v. *Turner,* 224 Mass. 229, 238. *Massachusetts Bonding & Ins. Co.* v. *Peloguin,* 225 Mass. 30. The argument chiefly urged by the defendant is that a verdict of guilty in the second degree must as matter of law be held to be a compromise verdict under the circumstances here disclosed. It cannot be held on this record that a verdict of guilty in the second degree was not rationally possible as matter of law. Hence in this respect there is no error of law.

A motion also was filed to set aside the verdict and to grant a new trial on the ground of newly discovered evidence. This motion was supported by affidavit. It was agreed that the affiant testified at the hearing upon the motion. The newly discovered evidence as disclosed on the record would have been admissible and pertinent if introduced at the trial. But the granting of a motion for a new trial on this ground ordinarily rests on sound judicial discretion both in criminal and civil cases and is not subject to review. *Commonwealth* v. *Borasky*, 214 Mass. 313, 322, and cases there cited. *Berggren* v. *Mutual Life Ins. Co. of New York*, 231 Mass. 173, 176, 177, and cases there collected. See, in this connection, *Hip Foong Hong* v. *H. Neotia & Co.* [1918] A. C. 888, 894. There is nothing on the present record to suggest an abuse of discretion or any error of law.

This record has been examined with great care in the light of the able argument and exhaustive brief in behalf of the defendant. We are constrained to say that no error appears.

*Exceptions overruled.*

*Orders denying motions for new trial affirmed.*