292 So.2d 465

**Charles Eugene WELLS, Alias Pete Wells**

v.

**STATE.**

6 Div. 405.

Court of Criminal Appeals of Alabama.

June 29, 1973.

Rehearing Denied Aug. 14, 1973.

**352**

J. Massey Relfe, Jr., Birmingham, for appellant.

William J. Baxley, Atty. Gen., and Herbert H. Henry, Asst. Atty. Gen., Birmingham, for the State.

LEIGH M. CLARK, Supernumerary Circuit Judge.

Appellant has twice been found guilty by a jury of first degree murder of his wife. In both instances a jury fixed his punishment at life imprisonment, and he was adjudged and sentenced accordingly by the trial court. An appeal from the first judgment and sentence resulted in a reversal by this Court. 46 Ala.App. 342, 241 So.2d 901. This is an appeal from the second judgment of conviction and sentence.

A succinct statement of facts narrated in the brief of attorney for appellant and adopted by attorneys for the State is as follows:

"In the evening hours of August 9, 1968, the Appellant, CHARLES EUGENE WELLS, went to the house where his wife and ten children were living at Robins Crossroads in Jefferson County, Alabama. At that time and occasion, the Appellant argued and had words with his son, Ronnie Wells; his daughter, Brenda Blackmon; and his wife, Elsie Wells.

"According to the testimony, shots were fired with a 25 caliber pistol and a shot gun. The shots resulted in the death of Elsie Wells and the wounding of Brenda Blackmon.

"There is testimony that the shots fired by the defendant with a 25 caliber pistol, struck and killed Elsie Wells. There is conflicting testimony as to the shot which struck and wounded Brenda Blackmon."

As bearing on the question of the sufficiency of the evidence to support the judgment appealed from, which we are required to consider even though not raised by appellant's brief, and on the question hereinafter discussed, which is raised by appellant's brief, we refer briefly to other testimony on the trial.

Brenda Blackmon and Ronnie Wells, daughter and son respectively of the appellant and of the victim, testified against appellant as to detailed circumstances of the alleged crime. Another son of appellant and the victim said that in May 1968, his father had stated "He was going to buy him a pistol, him or mother one was going to have to go. She would not live with him."

Brenda Blackmon testified that she was living with her mother and the rest of ten children of her mother and appellant, who at the time was living separate and apart from them; that appellant came to the house where they were living, and an argument ensued between appellant and the victim, in which Ronnie Wells joined. Appellant and Ronnie went out into the yard

for a while and returned into the house. The phone rang, which victim attempted to answer, but appellant jerked the wires out from the phone and snatched the receiver off the line. Appellant said he was tired of being pushed around, got his gun out of his pocket with his right hand, and his wife ran around from the living room through the kitchen door back into the front bedroom. Appellant followed his wife, and the witness followed appellant. Her mother got her purse on the night table and told appellant to let her go, that she and the kids would get out and let him have the house if that is what he wanted. The witness further testified that appellant had his arms on her mother and that she (the witness) got her arms around him and pulled him off; that appellant hit the witness with the gun; her mother proceeded to run out of the bedroom door; the witness saw two shots fired from the gun "in a row" and heard the reports; appellant had the gun in his hand; the witness struggled with appellant; the next thing the witness remembered her mother's body was lying on the floor; the witness was holding on to appellant and the pistol fired and hit her in the lower part of the right breast. She let go of the appellant as she was falling. She heard a loud blast, then saw appellant raise his right hand and aim, and the gun clicked. Appellant then turned and ran to the kitchen door; she saw the gun in appellant's hand. When the witness later looked the appellant was gone.

Ronnie Wells testified that as the appellant arrived at the house, appellant inquired as to the whereabouts of appellant's wife, the witness' mother, that appellant "low-rated" her, repeatedly calling her names; that said witness and appellant went into the kitchen, where fussing afterwards ensued between appellant and his wife, and thereafter the witness and the appellant went again into the yard. The witness said he returned to the kitchen of the house; that his mother thereafter locked the door from the porch into the kitchen while appellant was on the porch. The witness testified the appellant asked his wife to let him in, said he wanted to get a drink of water and that if she would let him in, he would go and leave her alone. She thereafter unlocked the door, and appellant came in the kitchen and went into the hall; the witness went into the bedroom and heard three shots fired; he grabbed a shotgun, obtained a shell, loaded the gun, and went into the hall. As he did so he saw his mother lying in the middle of the floor with blood coming out of her mouth and nose. He aimed to fire at appellant and fired the shotgun; he did not hit the appellant but hit the door facing; he then turned to go back in the bedroom. Appellant pointed a pistol toward the back of the witness after taking it "out of" the "side" of Brenda Blackmon. He saw the appellant's finger move and heard a click. The witness went back to get another shell and reloaded the gun and then saw the appellant in his car cranking it up and going out of the driveway.

There was evidence introduced on behalf of defendant consisting of the testimony of a deputy sheriff, who investigated the alleged homicide, and the physician who operated on Brenda Blackmon for the injury she received on the occasion involved, to the effect that her injury was caused by a rifle slug from a 20 gauge shotgun, such as the evidence showed was fired by Ronnie Wells, and not by a bullet from a small caliber pistol, such as the evidence indicated defendant was using. The first of said witnesses said that "if somebody was shot first with a small caliber, then hit with a shotgun", he couldn't tell "about the small caliber weapon", but if he was "shot only with a 25 caliber weapon and not at all with a shotgun, he could tell the difference." The other witness testified that he could not say "unequivocally" that there was not another wound made by a 25 caliber that entered closer to the midline and went out the other side of the body, but it would "have to be very coincidental".

Appellant insists that the trial court erred in not permitting, or in sustaining the State's objections to, testimony offered by defendant as indicated in part by the following portions of the record quoted from in appellant's brief:

"Q. [Question of Attorney for Defendant to Brenda Blackmon] In fact, I'll ask you this, if it isn't a fact that you instigated a prosecution against your father for assault with intent to murder on you? Isn't that a fact?"

\* \* \* \* \* \*

"[Attorney for Defendant]: Yes, sir. In behalf of the defendant, Charles Wells, we proffer to show through cross-examination and extrinsic evidence that this witness, Brenda Blackmon, initiated a groundless, malicious complaint against the defendant which resulted in him being charged with a felony, to-wit, assault with intent to murder, wherein she was the victim; that the statements which she made which caused the indictment to be preferred against him were untrue, groundless, false and malicious and that if allowed to show these facts we would. demonstrate to the jury the fact of her interest in the defendant's conviction and the fact that she is extremely prejudiced and biased against him which would impeach her credibility and which would detract from the substance of her direct testimony to the great benefit of the defendant. That is what we proffer to show."

Soon after the question quoted above, counsel for the parties and the trial court commenced an extended colloquy (covering nine or ten pages of the transcript) out of the presence of the jury, which ended soon after the statement of attorney for defendant quoted above. It is clear therefrom that defendant's counsel were attempting to interrogate the witness as to her involvement in the matter of a prosecution of her father for an assault with intent to murder her on the occasion involved, and defendant's counsel made it clear that the same

was for the purpose of showing bias on the part of the witness, but just what definite fact or facts they expected to show or what definite questions they planned to ask is far from clear. At about the conclusion of the colloquy, it seems that perhaps defendant's counsel were seeking chiefly to show that the accusations made by the witness against appellant, as to an assault with intent to murder her, were false, malicious and groundless. Counsel for defendant seemingly acceded to the suggestion by attorneys for the State that the word "instigated" made the question asked (and quoted above) objectionable, by stating that the question would be rephrased by asking the witness whether she "initiated it by a complaint or by signing a warrant or whatever." Thereafter the trial court interrogated the witness out of the presence of the jury as to whether she signed a warrant against her father accusing him, and she replied that she didn't remember, that she testified before the grand jury but she didn't recall signing anything at all. She further testified out of the presence of the jury that she told the grand jury that her father had shot her and that she afterwards learned that a case was made against him for assault with intent to murder her. She also testified out of the presence of the jury that she told Detective Maxwell, and the district attorney the same thing. The court inquired of her as to whether the testimony she gave the grand jury was essentially or substantially the same as she testified on the trial, and she answered in the affirmative.

At one time during the extended colloquy one of the attorneys for defendant indicated that a prosecution of the defendant on a charge of assault with intent to murder the witness was nol-prossed and that the defendant should be allowed to show evidence of such action, which the trial court stated it would not allow.

■ As strongly contended by defendant's attorneys on the trial and by appellant's attorney in his brief herein submitted, a party is allowed wide latitude in

cross-examination of a witness against him as to facts indicating bias of the witness against the party thus seeking to discredit the witness. The brief shows an admirable awareness of the large field of application of the principle and of the wealth of authorities to support it. Notwithstanding the commendable efforts of defendant's counsel on the trial and appellant's counsel on appeal, we think they miss the mark.

On the particular point or points involved, no definite question was asked or proposed other than the question as hereinabove quoted, which defendant's counsel offered to rephrase as indicated above. Defendant's counsel did not put the proposed rephrased question to the witness, nor did the court hold that it would sustain an objection to the proposed rephrased question.

Whatever was the witness' state of mind toward the defendant, there was nothing in any of the matters apparently sought to be inquired into to indicate that such state of mind was any different from what it was shown to have been by the testimony of the witness.

We are unable to say that there was any definite ruling of the trial court on the subject that adversely affected the appellant. Nor was any definite ruling invoked on such subject other than as to a question that the mentioned colloquy indicates would not have been answered favorably to defendant if correctly answered. Moreover, the colloquy shows that defendant's attorneys, apparently acceding to the ground of objection by the State to such question, offered to rephrase it, but as to any such rephrasing there was no definite invocation of a ruling.

 Some of the reasons justifying the action of the trial court as to the particular point or points involved are found in the opinion in Commonwealth v. Sansone, 252 Mass. 71, 147 N.E. 574, as follows:

"[4] Counsel for the defendant, in cross-examining a witness called by the commonwealth, asked:

" 'Did you discuss this case with any one since the accident?'

"Upon objection by the district attorney, counsel stated, in reply to an inquiry by the court, that his purpose in asking the question was to show that the witness had assisted the government in looking for witnesses and in prosecuting the case, and to disclose that the witness was prejudiced. The trial judge excluded the question. The defendant then asked the witness:

" 'Did you speak to a newsboy in Adams Square with reference to this case?'

"[5] Upon the statement of counsel for the defendant that that question was asked for the same purpose, the judge excluded it. The credit to be given a witness to material facts is not merely collateral, and reasonable cross-examination for the purpose of proving the falsity of his testimony or bias or prejudice on his part has been held to be a matter of right. Day v. Stickney, 14 Allen [96 Mass.], 255; Stevens v. Stewart-Warner Speedometer Corp., 223 Mass. 44, 111 N.E. 771; Commonwealth v. Russ, 232 Mass. 58, 79, 122 N.E. 176. The answers to the two questions asked would not in themselves have a tendency to show either of these things, and upon the offer of proof it is not possible to determine what facts counsel expected to bring out, and whether they, if established, would have a tendency to prove interest or prejudice. The offer did not suggest that the witness was employed or asked by the commonwealth to assist in the case; that he had any pecuniary interest in it, nor that he had expressed any ill will toward the defendant. It did not appear from the offer that the witness said anything to any one who did or could assist the commonwealth, and the witness was not asked if he had assisted

the commonwealth in any way. The offer was broader than the questions and in large part not responsive to them. Hallwood Cash Register Co. v. Prouty, 196 Mass. 313, 315, 82 N.E. 6. The only witnesses called were the witness being cross-examined, the daughter-in-law who accompanied the woman who was injured, the defendant, and a witness called by him. No newsboy or other witness was called either to testify or to prove that he was asked to testify.

"[6–8] The burden is on the party excepting to show that he has been harmed by a ruling. McGonigle v. Belleisle Co., 186 Mass. 310, 71 N.E. 569; Commonwealth v. Phelps, 210 Mass. 109, 114, 96 N.E. 69. It is not enough to state the purpose of an offer of this kind in such general terms that it does not disclose to the court the facts which, if established, would tend to show interest or prejudice. Ford v. Ford, 104 Mass. 198, 206. Prejudices are usually indicated by some form of expression. Day v. Stickney, supra. The witness being cross-examined was one on whom the commonwealth relied in part to prove the commission of the crime. Such a witness has the right, if not the duty, to assist at least to the extent of disclosing to the prosecuting attorney all facts within his knowledge material to the case, including the names of witnesses known to him. If he does no more than this he cannot fairly be charged with partisanship. The defendant has failed to show that the discretion of the court was not properly exercised in excluding the questions asked."

We hardly see how the trial court could have handled the problem better than it did. We are convinced that whatever rulings it may be considered that the court made against defendant on points discussed are covered by the principle that the trial court is vested with sound discretion as to the latitude and extent of cross-examination of a witness, and that its rulings in that respect should not be disturbed unless it clearly appears that defendant was prejudiced thereby. The principle applies to cross-examination of a witness as to his animus as well as other cross-examination. Benefield v. State, 44 Ala.App. 339, 208 So.2d 449, cert. denied 282 Ala. 19, 208 So.2d 455.

We have searched the record for any error prejudicial to defendant-appellant and have found none, which leads to the conclusion that the judgment appealed from should be affirmed.

The foregoing opinion was prepared by the Honorable LEIGH M. CLARK, Supernumerary Circuit Judge, serving as a Judge on this Court under § 2 of Act No. 288, Acts of Alabama, July 7, 1945, as amended; his opinion is hereby adopted as that of this Court.

Affirmed.

All the Judges concur.